# In the United States Court of Federal Claims

No. 21-1570C

(Filed Under Seal:  March 28, 2022)

(Reissued for Publication:  April 5, 2022)

|  |  |
|---|---|
| **IAP WORLDWIDE SERVICES, INC.,** | ) |
| *Plaintiff,* | ) |
| v. | ) |
| **THE UNITED STATES,** | ) |
| *Defendant,* | ) |
| **and** | ) |
| **VECTRUS SYSTEMS CORPORATION,** | ) |
| *Defendant-Intervenor.* | ) |

*Kara L. Daniels*, Arnold & Porter Kaye Scholer LLP, Washington, D.C., for Plaintiff.  Of counsel were *Nathaniel E. Castellano*, *Thomas A. Pettit*, and *Aime JH Joo*.

*Tanya B. Koenig*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.  With her on the briefs were *Brian M. Boynton*, Acting Assistant Attorney General, *Martin F. Hockey, Jr.*, Acting Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel was *Major Seth Ritzman*, Contract Litigation & Intellectual Property Division, United States Army Legal Services Agency, Fort Belvoir, VA.

*Adam K. Lasky*, Seyfarth Shaw LLP, Seattle, WA, for Defendant-Intervenor.  Of counsel were *Edward V. Arnold*, *Stephanie B. Magnell*, and *Bret C. Marfut*, Seyfarth Shaw LLP, Washington, DC.

<u>MEMORANDUM OPINION</u>*

*SOLOMSON*, **Judge.**

This case involves a billion dollar procurement; the range and number of the parties' arguments reflect the stakes of the dispute.

In this post-award bid protest action, Plaintiff, IAP Worldwide Services, Inc. ("IAP"), challenges the decision of Defendant, the United States — acting by and through the U.S. Department of the Army, Army Contracting Command–Aberdeen Proving Ground (the "Army") — to award the Operations, Maintenance, and Defense of Army Communications in Southwest Asia and Central Asia ("OMDAC-SWACA") contract to Defendant-Intervenor, Vectrus Systems Corporation ("Vectrus"). IAP contests that contract award as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, including provisions of the Federal Acquisition Regulation (the "FAR"). The parties filed cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC").

For the reasons set forth below, the Court finds for IAP on a single issue, but declines to issue either monetary or injunctive relief, at least on the record as it currently stands. Instead, the Court orders supplemental briefing on the question of appropriate relief. Whether this case ultimately yields IAP a pyrrhic victory remains to be seen.

## I.    FACTUAL BACKGROUND[1]

### A. The Solicitation

On April 3, 2019, the Army issued Solicitation No. W91RUS-19-R-0018 (the "Solicitation" or "RFP") for the OMDAC-SWACA contract, seeking operations and

---

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal on March 28, 2022, and directed the parties to propose redactions of confidential or proprietary information by April 4, 2022. The parties have jointly submitted proposed redactions to the Court. ECF No. 53. The Court adopts those redactions, in part, as reflected in this public version of the opinion. Words or phrases that are redacted entirely have been replaced with [ * * * ], while redactions via substitution are denoted simply in brackets (*e.g.*, [Alpha]).

[1] This background section constitutes the Court's findings of fact drawn from the administrative record. Judgment on the administrative record, pursuant to RCFC 52.1, "is properly understood as intending to provide for an expedited trial on the record" and requires the Court "to make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354, 1356 (Fed. Cir. 2005). Citations to the administrative record (ECF Nos. 26, 27, as amended by ECF No. 28) are denoted as "AR" followed by the page number. Additional findings of fact are made throughout Section V.

maintenance services for communications and information systems supporting the 160th Signal Brigade of the U.S. Army Central, its subordinate units, U.S. Central Command, and the U.S. Army Regional Cyber Center Southwest Asia.[2]  The services are for various locations, including sites in Afghanistan, Iraq, Kuwait, Bahrain, the United Arab Emirates, Jordan, and Qatar.[3]

The Solicitation informed potential offerors that the Army intended to award a single performance-based contract utilizing cost-plus-fixed-fee and cost-reimbursable contract line items ("CLINs"), with a performance period of two sixty-day phase-in periods, an eight-month base period, and four one-year option periods.  AR 3756 (§ B.2); AR 3974.  The planned contract is estimated to be worth over one billion dollars.[4]  Vectrus is the incumbent contractor for the services sought in the RFP.  AR 301 (Acquisition Plan).  Proposals were due on May 17, 2019.  AR 3951 (§ L.4.1.A).

The Solicitation instructed offerors to submit proposals addressing four factors (in descending order of importance):  (1) mission support/technical approach ("MS/TA"); (2) past performance; (3) cost; and (4) small business participation.  AR 3113 (§ M.1.A). The RFP similarly specified that this is a "best value" procurement and that "[a]ll non-cost factors[,] when combined[,] are significantly more important than the cost factor."  AR 3113 (§ M.1.A).  The Solicitation emphasized that "[o]fferors must clearly demonstrate their ability to meet all requirements specified in [the] solicitation" and that "[f]ailure to furnish full and complete information that demonstrates the [o]fferor's ability to satisfy the specified requirements may cause an offer to be considered unacceptable and therefore will be ineligible for award."  AR 3114 (§ M.1.A).  The Army cautioned offerors that "the [o]fferor with the lowest overall estimated cost to the [g]overnment" is not guaranteed to win the award, as the government may determine that "the non-cost benefits offered by another [o]fferor [may] warrant paying a higher cost."  AR 3113 (§ M.1.A).[5]

---

[2] AR 2784 (§ A), 3755–56 (§ B.1), 3768 (§§ C.1.0, C.2.0) ("Contractor shall provide . . . operation and maintenance (O&M) support of Title X telecommunications equipment and information systems that is U.S. Government owned or leased and under the operational purview of the Network Enterprise (NETCOM), 160th Signal Brigade and its subordinate units in the Southwest Asia (SWA) and Central Asia (CA) Theaters of operation.").

[3] AR 3768 (§ C.2.0).

[4] AR 306 (Acquisition Plan) ("The total estimated cost of [the] 160th Signal Brigade OMDAC-SWACA procurement over the life of the contract, including all options . . . is approximately $[ * * * ]."); AR 9168 (Initial Price/Cost Proposal Analysis) ("[T]he Independent Government Estimate (IGE) used for evaluation purposes is $[ * * * ].").

[5] The Solicitation provided that the Army would utilize "a best value approach that permits a trade-off assessment" and award the contract to the offeror "whose proposal conforms to the solicitation requirements" and "presents the best value to the [g]overnment, with appropriate

The Solicitation repeatedly advised offerors that "the [g]overnment intends to award a contract without discussions, but reserves the right to hold discussions, if necessary," and, thus, "cautioned" offerors "to examine [the] solicitation in its entirety and to ensure that their proposal[s] contain[] all necessary information, provide[] all required documentation, and [are] complete in all respects." AR 3952 (§ L.5.1.A); *see also* AR 3113 (§ M.1.A) ("[I]t is the [g]overnment's intention to award without discussions. Offerors are encouraged to present their best technical proposal and costs in their initial proposal submissions.  Should the Contracting Officer determine discussions are necessary[,] the [g]overnment reserves the right to hold them."); AR 3123 (§ M.5) (noting government's intent to award without discussions based upon initial offers). Nevertheless, the RFP provided that, in the event the Army decided to engage in discussions, "a competitive range will be determined and [o]fferors [will be] notified of inclusion/exclusion," but "[t]he competitive range may be limited for purposes of efficiency." AR 3113 (§ M.1.A).

## 1.   Factor 1 – Mission Support/Technical Approach

Pursuant to the Solicitation, the MS/TA factor is the most important evaluation factor in the best value calculus.  AR 3113 (§ M.1.A).  For this factor, the RFP required offerors to propose their management and technical solution based on the specific requirements listed in the Performance Work Statement ("PWS") and supporting documents, including technical exhibits and attachments.  AR 3960–61 (§ L.8.2).  The MS/TA evaluation factor is divided into four subfactors: (1) management ("Subfactor 1"); (2) technical ("Subfactor 2"); (3) property management ("Subfactor 3"); and (4) quality control ("Subfactor 4").  AR 3113 (§ M.1.A), 3115 (§ M.3).  Subfactor 1 is the most important subfactor, while Subfactor 2 is more important than Subfactors 3 and 4.  AR 3113 (§ M.1.A).

The RFP instructed Offerors that MS/TA proposals should be "sufficiently specific, detailed, and complete as to demonstrate clearly and fully that the [o]fferor has a thorough understanding and knowledge of the complexities inherent in the performance of this requirement."  AR 3960 (§ L.8.2).  Offerors were encouraged to provide "a holistic approach versus addressing each PWS element."  AR 3961 (§ L.8.2).  Furthermore, offerors were warned that "[s]tatements that the [o]fferor understands, can, or will perform the requirements of the PWS without supporting information or

---

considerations given to trade-offs between the cost and non-cost factors."  AR 3113 (§ M.1.A); *see also* AR 311 (Acquisition Plan) ("This acquisition will utilize a best value approach that permits trade-offs between cost and non-cost factors allowing the [g]overnment to accept other than the highest technically rated, and/or the lowest priced proposal."); AR 9169 (Initial Price/Cost Proposal Analysis) ("Evaluation and award of this contract will be made in accordance with the Best Value Continuum Tradeoff procedures described in Federal Acquisition Regulation (FAR) 15.101-1, Tradeoff Process for a Best Value Decision.").

narratives are inadequate." AR 3960 (§ L.8.2); *see also* AR 3953 (§ L.6.2) (warning offerors that "[u]nless specifically stated," offerors shall not "paraphrase the requirements of the PWS, or use phrases such as 'unsurpassed levels of reliability,' or 'standard techniques will be employed'"); AR 3961 (§ L.8.2) (similar instructions); AR 3961 (§ L.8.2) (cautioning that "[p]roposals that merely mimic the PWS may receive a less favorable evaluation rating"); AR 4112 (Source Selection Plan) ("mere promises to comply with contractual requirements are insufficient basis for a favorable rating; evidence is required in support of any statements relating to promised performance").

For Subfactors 1 and 2, the RFP provided that proposals would be adjectivally rated as "Outstanding," "Good," "Acceptable," "Marginal," or "Unacceptable."[6] AR 3116 (§ M.4.a). These ratings were to be based on the Army evaluation team's "consideration of risk" together with an offeror's assessed "strengths, weaknesses, significant weaknesses, uncertainties, and deficiencies." AR 4113 (Source Selection Plan). Subfactors 3 and 4, in contrast, were rated on a pass/fail basis. AR 3116 (§ M.3.1). For each offeror's overall MS/TA rating, the Army evaluators developed a consensus for the adjectival rating utilizing the same scale as for Subfactors 1 and 2. AR 3116 (§ M.3.1).

To be considered for award, an offeror had to receive an overall MS/TA rating of "Acceptable" or higher. AR 3113 (§ M.1.A). An offeror that received a rating of less than "Acceptable" (*i.e.*, "Marginal" or "Unacceptable") on "Sub-factors 1 *and* 2," or a failing score on "Sub-factors 3 *and* 4," would "not move forward in the source selection process, and [would] not be considered for award." AR 3113–14 (§ M.1.A) (emphasis added).

### a. Subfactor 1 – Management

For Subfactor 1, the RFP directed offerors to propose an "effective management approach/solution," and "describe, in detail, [their] overall experience and [m]anagement approach for this effort, understanding of the requirement, feasibility of the approach, and completeness of the proposed solution." AR 3116–17 (§ M.4), 3961

---

[6] An "Outstanding" rating is assigned to a proposal that "indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low." AR 3116 (§ M.4.a). A "Good" rating is assigned to a proposal that "indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate." AR 3116 (§ M.4.a). An "Acceptable" rating is assigned to a proposal that "meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate." AR 3116 (§ M.4.a). A "Marginal" rating is assigned to a proposal that "has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high." AR 3116 (§ M.4.a). An "Unacceptable" rating is assigned to a proposal that "does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable," and, as such, the "[p]roposal is unawardable." AR 3116 (§ M.4.a).

(§ L.8.2.A).  This portion of the proposal had to contain:  (1) the offeror's methodologies related to its corporate and program management organizational approach/solution (§ L.8.2.A.1); (2) methodologies and solution to provide government "oversight and/or tracking in . . . key areas," including key personnel (§ L.8.2.A.2); (3) "managing multiple locations across the theater with varying types and size sites" (§ L.8.2.A.3); (4) a contract "phase-in" plan and procedures for in-processing new employees (§ L.8.2.A.4); (5) "change management and continuous process and service improvement" (§ L.8.2.A.5); (6) recruitment and retention, including a description of how full performance will be maintained during employee absences (§ L.8.2.A.6); and (7) training and certification program (§ L.8.2.A.7).[7]  AR 3961–62.

In general, for Subfactor 1, the Army evaluated proposals to determine the offeror's "capability and experience to provide an effective management approach/solution."  AR 3116 (§ M.4.b).

### b. Subfactor 2 – Technical

With respect to Subfactor 2, the RFP instructed offerors to address three elements: technical approach, staffing capability, and labor category descriptions.  AR 3962–64 (§ L.8.2.B).  First, the RFP directed offerors to "describe the proposed technical approach for performing the technical requirements set forth in the PWS," its attachments, and technical exhibits, including:

- Capability to support the Layered Defense of the Army network.

- Capability to support operating, maintaining[,] and defending the following: United States Army Regional Cyber Center-Southwest Asia (USARCC-SWA), Regional Network Operations and Security Center (RNOSC), Post/Camp/Station (P/C/S) Support, Communication Support Services, Telephone, Inside Plant/Outside Plant, and Cable, Transmission Services, Supporting the Theater Logistics Support Facility (TLSF) functions.

- Capability to support the existing and emerging communications systems and facilities.

AR 3962–63 (§ L.8.2.B.1).  Offerors had to demonstrate that their technical approach reflected "an understanding of the technical requirements to provide support for the

---

[7] Sections L.8.2.A.3, L.8.2.A.4, and L.8.2.A.6 of the RFP indicated that offerors who "thoroughly demonstrate" an approach in those areas "may receive a more favorable rating" on Subfactor 1. AR 3961–62.

identified services listed in [the PWS], inclusive of Attachments and Technical Exhibits." AR 3963 (§ L.8.2.B.1). Offerors also were directed to "discuss [their] ability to plan, organize, implement, sustain, and adapt to changing environments in response to the specifications set forth in the PWS." AR 3963 (§ L.8.2.B.1).

Second, offerors were required to demonstrate their "[c]apability to [s]taff the [e]ffort." AR 3963 (§ L.8.2.B.2). In that regard, offerors were instructed to propose a staffing solution based on the technical requirements in the PWS, including Technical Exhibit 2 (Supported Locations). AR 3117 (§ M.4.c); *see also* AR 3823 (§ C.4.4) ("The [c]ontractor shall provide staffing to accomplish the requirements of the PWS. Normal hours of operation for each site are specified in [Technical Exhibit] 2."); AR 3743 (RFP Amendment 0003, Section A – RFP Questions/Answers) ("The [o]fferor shall propose their solution based on the requirements in the PWS and throughout the solicitation ([Technical Exhibits], etc[.]) . . . .").

In contrast to the performance *requirements* contained in Technical Exhibit 2, the Army provided *estimated* staffing levels in RFP Attachment 8 and *estimated* workload data in RFP Attachment 9 "to assist [o]fferors in understanding the magnitude of the requirement." AR 3969 (§ L.8.4.7). Based on the information the Army provided, offerors had to "develop their own proposed number and type of workforce to perform those functions" and provide a staffing matrix that addressed "overall staffing structure and staffing levels by site based on [the offerors'] proposed technical [approach]." AR 3963 (§ L.8.2.B.2). Specifically, offerors were required to submit detailed information about the type and level of support in each proposed labor category, including: (1) specific job title; (2) part-time or full-time position; (3) total hours per week; (4) work days; and (5) employee duty hours. AR 3963 (§ L.8.2.B.2). Offerors were warned against "merely mimicking" the estimates in Attachments 8 and 9 and were advised instead to "propose an innovative staffing solution based off workload data." AR 3963 (§ L.8.2.B.2); *see also* AR 3743 (RFP Amendment 0003, Section A – RFP Questions/Answers) ("[Attachment 8] is the is the government estimate of personnel. [It is] not intended to be an [o]fferor's solution, rather examples of possible solutions."). Additionally, offerors were to "provide their recommended fill rate(s) at full performance start date, and describe their plans to maintain these resources through the life of the contract." AR 3963 (§ L.8.2.B.2). Finally, the Solicitation provided that "proposal[s] [that] thoroughly demonstrate[]" a capability to staff the effort "may receive a more favorable rating for [Subfactor 2]," and "proposal[s] [that] merely mimic[] the estimate[s]" in Attachments 8 and 9 "may receive a less favorable evaluation rating." AR 3963 (§ L.8.2.B.2).

Third, the RFP required offerors to provide a chart that included descriptions of the qualification requirements for each proposed labor category "that reflect the qualification requirements in the PWS and its Technical Exhibits," including "qualifications, type of experience, education, training[,] and certifications." AR 3964

(§ L.8.2.B.3). Specifically, offerors had to "provide the following information in the [following] specified format for each proposed labor category":

| Job Title/Labor Category | Security Clearance | Experience & Education | Skill Set Certification(s) | Training Required | IT/IAT/IAM/Other Certification(s) and Level |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

AR 3964 (§ L.8.2.B.3).

The Army evaluated an offeror's Subfactor 2 proposal for compliance with the "technical requirements" in the PWS, including whether the offeror "demonstrate[d] an understanding of the requirement to provide support to the identified services listed in [the PWS], inclusive of Appendices." AR 3117 (§ M.4.c).

### c. Subfactor 3 – Property Management

For the property management subfactor, the Solicitation instructed offerors to "describe [an] adequate system of internal controls to manage (control, use, preserve, protect, repair and maintain) [g]overnment property in its possession." AR 3964 (§ L.8.2.C). The Army assessed this subfactor on a pass/fail basis. AR 3116 (§ M.3.1)

### d. Subfactor 4 – Quality Control

Finally, the quality control subfactor required offerors to "describe, in detail, the proposed quality of the services provided under this contract, and the manner in which they are monitored." AR 3964 (§ L.8.2.D). As with Subfactor 3, the Army assessed Subfactor 4 on a pass/fail basis. AR 3116 (§ M.3.1).

### 2. Factor 2 – Past Performance

The past performance factor required the Army to "evaluate the [o]fferor's record of past and current performance to ascertain the probability of successfully performing the required efforts of the PWS." AR 3118 (§ M.4.3). Offerors had to provide a "[l]ist of [p]ast [p]erformance [r]eferences," and each reference listed was required to submit a "Past Performance Questionnaire" (RFP Attachment 11) detailing the offeror's past work. AR 3965 (§ L.8.3.A.1). Additionally, the RFP instructed offerors to "submit a description of their [g]overnment and/or [c]ommercial contracts . . . in performance during the past three (3) years[,] which are relevant to the efforts required by this solicitation," along with "at least three (3), but no more than five (5), referenced contracts . . . that are relevant in type and magnitude." AR 3965 (§ L.8.3.A.2).

8

In assessing this factor, the Army conducted "a performance risk assessment based on the relevancy and recency of the [o]fferor's past performance, as well as that of its proposed subcontractors and team members as it relates to the probability of successful accomplishment of the required effort."  AR 3118 (§ M.4.3).  Thus, for this factor, the Army assigned offerors both a "relevancy" rating ("Very Relevant," "Relevant," "Somewhat Relevant," or "Not Relevant") and a "confidence" rating ("Substantial Confidence," "Satisfactory Confidence," "Neutral Confidence," "Limited Confidence," or "No Confidence").  AR 3119–20 (§ M.4.3).

### 3.  Factor 3 – Cost

The Army assessed the cost factor independently of all other factors.  AR 8877 (SSEB Briefing Slides).  The Solicitation indicated that an offeror's overall proposed cost "shall consist of the total of the cost identified in Schedule B of the solicitation for the 8-month base year and each of the four option years of the contract, to include the fee amounts."  AR 3121 (§ M.4.4.b).  Offerors had to submit a "cost workbook" with "cost worksheets" and a cost narrative that "describes the methodology used in the development of the cost factors and the total proposed cost."  AR 3967 (§ L.8.4).  Furthermore, offerors were instructed that the information submitted in the cost workbook "shall fully support the development of each proposed Schedule B CLIN[] price."  AR 3967 (§ L.8.4.1).  Like the MS/TA factor, the cost factor instructions discouraged offerors from mimicking the estimated staffing and workload data and indicated that those that do so may receive "a less than favorable" rating.  AR 3969 (§ L.8.4.7).

Offerors were further directed to submit two cost proposals: a "sanitized" version and an "unsanitized" version.[8]  AR 3969 (§ L.8.4.5).  The Solicitation indicated that the sanitized version "will be provided to the [MS/TA] team to capture any [labor] hour adjustments for cost realism analysis."  AR 3969 (§ L.8.4.5).

In accordance with FAR 15.404–1 ("Proposal analysis techniques"), the RFP indicated that the Army would evaluate cost based on "an assessment of cost realism and most probable cost . . . to determine the reasonableness of proposed costs in relation to the [o]fferor's specific technical approach."  AR 3121 (§ M.4.4.a).  As is typically the case in a procurement involving a cost-reimbursement contract, the Army was not limited to assessing an offeror's proposed costs, but rather the Army developed a most probable cost ("MPC") estimate the Army employed "in making the best value determination."

---

[8] An "unsanitized" cost proposal is a "complete cost proposal[] that include[s] all required information."  AR 3969 (§ L.8.4.5).  A "sanitized" cost proposal is one that "exclude[s] all company proprietary or sensitive data, including cost and price information, but must include a breakdown of the total labor hours and categories proposed by task and a breakout of the types of all proposed [o]ther [d]irect [c]osts."  AR 3969 (§ L.8.4.5).

AR 3121 (§ M.4.4.b).  The RFP further informed offerors that the evaluators "may also use other techniques," including "comparison of prices based on adequate price competition, comparison to the [Independent Government Cost Estimate] in addition to, or in combination with cost realism to determine price reasonableness."  AR 3121 (§ M.4.4.d).

### 4. Factor 4 – Small Business Participation

The small business participation factor required offerors to submit a proposed "Small Business Participation Commitment Document."  AR 3970 (§ L.8.5).  The Army rated each offeror's "commitment to use small businesses" as "Outstanding," "Good," "Acceptable," "Marginal," or "Unacceptable" based on the "Small Business Participation Rating Method."  AR 3122 (§ M.4.5).

## B. Proposals, Evaluations, and Contract Award

The Army received timely proposals from five offerors:  (1) IAP; (2) [Kilo]; (3) [Alpha]; (4) [Juliet]; and (5) Vectrus.  AR 4152–4916 (IAP Proposal); AR 4917–5525 ([Kilo] Proposal); AR 5526–6524 ([Alpha] Proposal); AR 6525–7891 ([Juliet] Proposal); AR 7892–8640 (Vectrus Proposal).  Each offeror was assigned a phonetic code name to be used during the evaluation process: "Alpha" for [ * * * ], "Delta" for IAP, "Foxtrot" for Vectrus, "Juliet" for [ * * * ], and "Kilo" for [ * * * ].  AR 2074 (RFI Special Notice No. 8); AR 2076–80 (Naming Convention Assignments).

### 1. The Army's Evaluation of Proposals

In accordance with the Source Selection Plan, the Source Selection Team was comprised of a Source Selection Evaluation Board ("SSEB"), a Source Selection Advisory Council ("SSAC"), and a Source Selection Authority ("SSA").  AR 9311 (SSEB Initial Report); *see also* AR 4107 (Source Selection Plan).  The SSEB conducted the first review and consisted of separate teams to evaluate each of the four evaluation factors the Solicitation identified.  AR 4109, 4117.  The SSEB consolidated the findings of the individual teams into a single report.  AR 4109, 4117.  The SSAC conducted the second review.  AR 4108–09, 4117.  The SSAC "[r]eview[ed] the evaluation results of the SSEB to ensure the evaluation process follow[ed] the evaluation criteria and the ratings [were] appropriately and consistently applied" and "[c]onsolidate[d] the advice and recommendations . . . into a written comparative analysis and recommendation" for the SSA to consider.  AR 4108–09; *see also* AR 9388 (SSAC Final Report).  The SSA conducted the final review, comparing "the proposals to determine the offer(s) that represent[ed] the best value to the [g]overnment, taking into consideration the stated evaluation factors, and their respective weightings as specified in the RFP."  AR 4118–19; *see also* AR 9399 (Source Selection Decision Document).

### a.  The MS/TA Evaluation

Members of the MS/TA evaluation team "independently evaluated each proposal with respect to each of the subfactors within the [MS/TA] [f]actor," AR 9402, and assigned strengths, weaknesses, deficiencies, and uncertainties based on the following definitions contained within the Source Selection Plan:

- o  Significant Strength: An aspect of an [o]fferor's proposal that has appreciable merit or appreciably exceeds specified performance or capability requirements in a way that will be appreciably advantageous to the [g]overnment during contract performance.

- o  Strength: An aspect of an offeror['s] proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the [g]overnment during contract performance.

- o  Weakness: A flaw in the proposal that increases the risk of unsuccessful contract performance.  See FAR 15.001.

- o  Significant Weakness: A flaw in the proposal that appreciably increases the risk of unsuccessful contract performance.  See FAR 15.001.

- o  Deficiency: A material failure of a proposal to meet a [g]overnment requirement or a combination of significant weakness[es] in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.  See FAR 15.001.

- o  Uncertainty: An aspect of a non-cost/price factor proposal which the intent of the offer is unclear (e.g., more than one way to interpret the offer or inconsistencies in the proposal indicating that there may have been an error, omission, or mistake).[9]

AR 9072 (MS/TA Team Initial Report); *see also* AR 4115–16 (Source Selection Plan).

---

[9] These definitions are consistent with the FAR's definitions of "deficiency," "weakness," and "significant weakness." *See* FAR 15.001 (defining "[d]eficiency" as "a material failure of a proposal to meet a [g]overnment requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level," "[w]eakness" as "a flaw in the proposal that increases the risk of unsuccessful contract performance," and "significant weakness" as "a flaw that appreciably increases the risk of unsuccessful contract performance").

After each team member independently reviewed the proposal evaluations, the MS/TA team "[m]embers then conducted a team discussion to establish consensus ratings" for the subfactors, while a "property management subject matter expert independently reviewed and evaluated" Subfactor 3. AR 9071. The MS/TA team composed draft Evaluation Notices ("ENs") to be used in discussions. AR 9104–29.

### i.   IAP's MS/TA Evaluation

The MS/TA evaluation team, in its initial report, found that IAP's "proposal did not meet the requirements of the solicitation, and contained one or more deficiencies." AR 9073. The MS/TA team accordingly assigned IAP an overall rating of "Unacceptable" for the MS/TA evaluation factor. AR 9073. In particular, for Subfactor 1, IAP received one significant strength, one strength, and one weakness, resulting in a "Good" rating overall.[10] AR 9073–76. For Subfactor 2, IAP received one deficiency, one significant weakness, one weakness, and one uncertainty, resulting in an overall "Unacceptable" rating for that subfactor. AR 9073, 9076–79. In sum, the MS/TA evaluation team found that IAP "has not demonstrated an adequate approach and understanding of the requirements," and, thus, "[t]he risk of unsuccessful performance is unacceptable and the proposal is unawardable." AR 9073.

The SSEB adopted the MS/TA team's evaluation findings, including IAP's "Unacceptable" rating for the MS/TA factor, and found IAP ineligible for award. AR 9319 (SSEB Initial Report) ("The proposal from [IAP], whose overall rating for [the MS/TA] factor was **Unacceptable**, did not meet the minimal **Acceptable** rating required for contract award consideration."). Specifically, as relevant to this protest, the SSEB assigned IAP a deficiency on Subfactor 2 due to IAP's failure to adequately address the Outside Plant ("OSP") support requirements:

> [IAP]'s proposal does not address the Outside Plant (OSP) technical requirement in PWS paragraph C.3.7.2, which supports all Iraq P/C/S. [IAP] proposed centralizing the Inside Plant (ISP)/OSP teams by region where travel and movement are feasible (Volume 2, paragraph 2.2.3.5.3, page Vol. 2 - 72). The lack of support for the OSP requirement creates a capability gap to support the OSP infrastructure at P/C/S level within Iraq. The lack of OSP support within Iraq is a deficiency because the proposal failed to provide OSP support in accordance with [Technical Exhibit 2], which specifies current locations and systems to be supported.

---

[10] The Court does not discuss Subfactor 1 ratings in detail, as IAP abandoned all claims concerning it. *See* discussion *infra* Section V.F. Similarly, IAP's amended complaint does not challenge the Army's assessment of Subfactors 3 or 4.

[IAP]'s approach increases the risk of unsuccessful contract performance to an unacceptable level because —

1    [IAP] did not identify the regions where teams would provide support.

2    Although [IAP] proposed that [Network Administrators] would provide the OSP support, [IAP] removed the [Network Administrators] at all locations in Iraq (Volume 2, paragraph 2.2.11, page Vol. 2 - 85).

AR 9348.

Additionally, the SSEB assigned IAP a significant weakness on Subfactor 2 because IAP proposed to reduce the number of Network Administrators without adequately demonstrating how this approach would meet the workload requirements. The SSEB also assigned a weakness for IAP's failing to adequately demonstrate how its "top-down approach," which eliminates many Systems Administrators, could meet the workload requirements. AR 9347–48. An uncertainty was assigned on Subfactor 2 for inconsistencies between IAP's proposed labor hours in its sanitized cost workbook and in its staffing matrix. AR 9348–49.

## ii.   Vectrus's MS/TA Evaluation

In contrast to IAP, Vectrus received an overall "Outstanding" rating for the MS/TA factor. AR 9093 (MS/TA Team Initial Report). Specifically, for Subfactor 1, Vectrus received two significant strengths and two strengths, resulting in a rating of "Outstanding." AR 9093–96. As for Subfactor 2, Vectrus received one significant strength and one uncertainty, resulting in a rating of "Good." AR 9096–99.

The SSEB adopted the MS/TA team's evaluation of Vectrus, finding that Vectrus's "proposal indicates an exceptional approach and understanding of the requirements," with "multiple strengths" and minimal risk of "unsuccessful performance." AR 9355 (SSEB Initial Report). Specifically, for Subfactor 1, the SSEB found that Vectrus's experience in southwest Asia and its organizational approach are "appreciably advantageous" to the government, and thus constitute a significant strength. AR 9355–56. Furthermore, the SSEB found Vectrus's phase-in approach to be a significant strength, as it "exceed[s] the [g]overnment's requirements and ha[s] appreciable merit, providing support that will be appreciably advantageous to the [g]overnment." AR 9356.

For Subfactor 2, the SSEB assigned Vectrus a significant strength for Vectrus's "technical experience" within southwest Asia, finding Vectrus "demonstrated an in-depth knowledge of operating, maintaining, and defending large, complex series of

communications networks deployed to the battlefield," which has "appreciable merit and will be appreciably advantageous to the [g]overnment." AR 9356–57.  While Vectrus was assigned an uncertainty for inconsistencies in the proposed labor hours in its staffing matrix and in its sanitized cost workbook, these findings "did not affect" Vectrus's Subfactor 2 rating.  AR 9357.

### b.  The Cost Evaluation

The cost team evaluated offerors' respective cost proposals.  AR 9165 (Initial Price/Cost Proposal Analysis).  Criteria used to evaluate the cost factor included: (1) total proposed price; (2) direct labor rates; (3) overtime; (4) indirect labor rates; (5) other direct costs; (6) Defense Base Act insurance; and (7) total evaluated price, including the probable cost of performance.  AR 9169–70.

In accordance with FAR 15.404-1, the cost team conducted cost realism analyses.  AR 9183.  First, the cost team conducted a cost realism analysis on the offerors' prices to determine whether the proposed costs are "[r]ealistic for the work to be performed," "[r]eflect a clear understanding of the requirements," and "[a]re consistent with the various elements of the offeror's [MS/TA] factor."  AR 9183.  The cost team also conducted an MPC analysis "to determine the realism and reasonableness of proposed costs in relation to the offeror's specific technical approach."  AR 9183.

As delineated in the Solicitation, the MS/TA evaluators utilized the offerors' sanitized cost proposals to assess whether the proposed labor hours were realistic based on the proposed technical approach.  AR 9322 (SSEB Initial Report).  Any inconsistencies between the labor hours proposed in the offeror's technical approach and the sanitized workbook were identified and relayed to the cost team for its cost realism analysis.  AR 9197–9220 (Cross-Team Exchanges Between Cost Team and MS/TA Team).  Based on the MS/TA team's evaluation, the cost team conducted a cost realism analysis on the proposed labor hours and adjusted them accordingly.  AR 9184.  The cost team adjusted four offerors' proposed labor hours upward (IAP, Vectrus, [Kilo], and [Juliet]), but adjusted [Alpha]'s proposed labor hours downward.[11]  AR 9184.  Finally, the cost team performed a cost realism analysis on the offerors' labor rates and adjusted those rates where appropriate.  AR 9187–88, 9195.

---

[11] The MS/TA team initially noted a discrepancy in Vectrus's calculation of its hours — specifically, that "there was a formula error" in Vectrus's cost workbook, which resulted in "significantly underestimat[ed]" labor hours.  AR 9184.  The cost team later determined, however, that "[a]lthough the total hours were calculated incorrectly" — that is, in the spreadsheet — "the manner in which [Vectrus] calculated its proposed costs was correct."  AR 9193; *see also* AR 9362–63 (SSEB Initial Report).  Thus, Vectrus's labor hours were adjusted to account for what was simply a spreadsheet formula error.  AR 9193; AR 9362–63; *see also* discussion *infra* Section V.D.2.

The cost team determined that IAP had the lowest total proposed price of $[ * * * ] and the lowest total evaluated price of $776,954,538.  AR 9171, 9183.  Vectrus had the second highest total proposed price of $[ * * * ] and the second highest total evaluated price of $1,027,490,421.  AR 9171, 9183.  The cost team noted, however, that although IAP's proposed price was the lowest, IAP's "average per hour [was] the highest at $[ * * * ] since its proposed hours are much lower as compared to the other offerors."  AR 9185, 9195.

### 2. Contract Award

The SSAC, upon review of the SSEB evaluation results, determined that Vectrus provided "the best overall proposal for non-cost factors" and that Vectrus's "ratings for [MS/TA] [a]pproach provide the Best Value to the [g]overnment" and is "worthy of the additional cost."  AR 9397 (SSAC Final Report).  Accordingly, the SSAC recommended awarding the contract to Vectrus.  AR 9388.

As for IAP, the SSAC rated IAP as "Unacceptable" on the MS/TA factor and found IAP's proposal unawardable, just as the SSEB had.  AR 9391.  Additionally, the SSAC concluded that "[i]t is unlikely" that IAP would be able to "rectif[y]" its Subfactor 2 problems via discussions, but the SSAC did not further explain the rationale or basis for that conclusion.  AR 9392.

The SSA, after consulting the SSEB and SSAC reports, compiled a Source Selection Decision Document ("SSDD") explaining the ratings given to the five offerors in each evaluation category.  AR 9399–9413 (SSDD).  The following table summarizes the offerors' ratings on each factor:

| Factor/Subfactor | Rating/Cost | | | | |
| --- | --- | --- | --- | --- | --- |
| | [Alpha] | IAP | Vectrus | [Juliet] | [Kilo] |
| MS/TA | Good | Unacceptable | Outstanding | Good | Acceptable |
| Subfactor 1 | Good | Good | Outstanding | Good | Acceptable |
| Subfactor 2 | Acceptable | Unacceptable | Good | Acceptable | Acceptable |
| Subfactor 3 | Pass | Pass | Pass | Pass | Pass |
| Subfactor 4 | Pass | Pass | Pass | Pass | Pass |
| Past Performance | | | | | |
| Relevancy | Very Relevant | Very Relevant | Very Relevant | Very Relevant | Very Relevant |
| Confidence | Substantial | Substantial | Substantial | Substantial | Substantial |
| Cost | | | | | |
| Total Proposed Price | $[ * * * ] | $[ * * * ] | $[ * * * ] | $[ * * * ] | $[ * * * ] |
| Total Evaluated Price | $[ * * * ] | $776,954,538 | $1,027,490,421 | $[ * * * ] | $[ * * * ] |
| Small Business Part. | Good | Good | Acceptable | Outstanding | Acceptable |

AR 9404.

Given IAP's overall "Unacceptable" rating for the MS/TA factor, the SSA concluded that IAP was ineligible for the contract award. AR 9405 ("[IAP] is not eligible for award based on Unacceptable ratings in Subfactor 2, Technical Approach, and in the [o]verall [MS/TA] factor rating."). The other four offerors qualified for consideration. AR 9404 ("[F]our offerors are eligible for award consideration, while one, [IAP], is not eligible for award based on an Unacceptable rating within Mission Support/Technical Approach Factor.").

Of the remaining offerors, the SSA found that [Kilo] "does not offer the best value for the government," as it had "the lowest acceptable ratings" on the MS/TA and small business participation factors and the highest total proposed price and total evaluated price; thus, the SSA concluded that [Kilo] "does not provide any technical or non-price benefit to the [g]overnment that would justify the significantly higher price over other higher-rated, lower priced eligible proposals." AR 9410. Furthermore, while Vectrus had a higher total proposed price and total evaluated price than [Alpha] or [Juliet], the SSA determined that "the underlying merits of [Vectrus's] Outstanding rating for Mission Support/Technical Approach, combined with substantially the same or better benefits under Past Performance and Small Business, as compared to Offerors Alpha and Juliet, provides the best overall proposal, non-cost factors considered." AR 9412.

Based on the best value "trade-off assessment," the SSA determined that "there is one offeror that offers the best value to the government and discussions are not required." AR 9404. The SSA further explained:

> Based on an integrated assessment of the proposal evaluations and the drafted evaluation notices, I have determined that discussions would not result in any meaningful benefit to the [g]overnment, or any changes to the apparent outcome of the source selection decision. Thus, in accordance with the terms and conditions of the solicitation, a contract will be awarded without discussions and a competitive range will not be established.

AR 9409; *see also* AR 9420 (Price Reasonableness Memorandum) (explaining that "discussions were not entered into" because "[t]he SSA believed that discussions would not be meaningful, as the deficiencies, weaknesses, and uncertainties annotated in the evaluations would not produce higher evaluations, or markedly different cost(s)").

Ultimately, the SSA followed the SSAC's recommendation and selected Vectrus for award, determining that its proposal "represents the best value to the [g]overnment based on the . . . trade-off analysis" with a "fair and reasonable" proposed cost/price. AR 9413. Accordingly, on December 23, 2020, the Army notified Vectrus of its contract award. AR 9435–36 (Notice of Contract Award to Vectrus). That same day, the Army

transmitted letters to IAP, [Kilo], [Alpha], and [Juliet], informing them of the contract award to Vectrus.  AR 9423–34 (Notices to Unsuccessful Offerors).

On December 29, 2020, the Army officially awarded the OMDAC-SWACA contract to Vectrus.  AR 9438–9748 (Contract No. W91RUS-21-C-0001).  On March 1, 2021, Vectrus commenced performance.  AR 12145.

## II.   PROCEDURAL HISTORY

On March 8, 2021, IAP filed a post-award protest with the Government Accountability Office ("GAO"), raising numerous challenges to the Army's evaluation of IAP's proposal and the Army's decision to award the OMDAC-SWACA contract to Vectrus.[12]   AR 12132–43 (unredacted version of GAO's decision); *IAP Worldwide Servs., Inc.*, B-419647, 2021 CPD ¶ 222, 2021 WL 2766441 (Comp. Gen. June 1, 2021) (public version).  Among other grounds, IAP alleged that the Army:  (1) "unreasonably evaluated IAP's proposal," and "erred by assessing its proposal with a deficiency and other weaknesses"; (2) "fail[ed] to assign strengths for features of IAP's proposal that allegedly exceeded the [S]olicitation's requirements"; (3) "engaged in an unreasonable and unequal evaluation because [Vectrus]'s proposal similarly should have been evaluated as deficient"; and (4) "erred in making award without conducting discussions."  AR 12136; *IAP Worldwide Servs.*, 2021 WL 2766441, at *5.

The GAO denied IAP's protest, finding that the Army reasonably assessed IAP's proposal as technically unacceptable — and thus was unawardable — for failing to conform to the Solicitation's material terms and conditions concerning OSP support in Iraq.  AR 12142; *IAP Worldwide Servs.*, 2021 WL 2766441, at *10.  The GAO also concluded that the Army's decision to award without discussions was reasonable, notwithstanding that "DFARS section 215.306(c) establishes an expectation that discussions will be conducted in Department of Defense procurements valued over $100 million" because "agencies retain the discretion not to conduct discussions based on the particular circumstances of each procurement."  AR 12142; *IAP Worldwide Servs.*, 2021 WL 2766441, at *11.  As for the remaining protest allegations, the GAO determined that IAP lacked standing to challenge any other issues concerning the evaluation process.  AR 12143; *IAP Worldwide Servs.*, 2021 WL 2766441, at *12.

On July 13, 2021, IAP filed its initial complaint against the United States in this Court.  ECF No. 1.  The next day, Vectrus filed an unopposed motion to intervene, ECF No. 10, which the Court granted, Minute Order (July 14, 2021).  On August 4, 2021, the government filed the administrative record, ECF Nos. 26, 27, and on August 5, 2021, this Court granted the government's motion to file missing portions of the administrative

---

[12] Following the filing of IAP's GAO protest, the Army issued, on March 15, 2021, a "stop work" order on the contract.  AR 10776–78.

record, ECF No. 28.  On August 27, 2021, with permission from the Court, IAP filed an amended complaint.  ECF No. 30 ("Am. Compl.").

IAP's amended complaint raises a bevy of claims that proved difficult to untangle. In particular, IAP alleges that the Army:  (1) abused its discretion in failing to conduct discussions (Count I); (2) arbitrarily and unequally assigned IAP a deficiency on Subfactor 2 (Count II.A); (3) abused its discretion in failing to engage in clarifications with IAP concerning the deficiency (Count II.B); (4) arbitrarily assigned IAP a significant weakness and a weakness on Subfactor 2 (Count II.C); (5) improperly determined that Vectrus (as well as [Juliet] and [Kilo]) complied with the Solicitation's Information Technology Infrastructure Library Foundation certification requirement (Count III); (6) arbitrarily assigned IAP a weakness on Subfactor 1 (Count IV); (7) arbitrarily and unequally ignored "[m]aterial [o]missions" in Vectrus's proposal (Count V.A); (8) unequally assigned Vectrus a strength for its recruiting ability while not assigning a comparable strength to IAP (Count V.B); (9) improperly overlooked Vectrus's "material misrepresentation" concerning the availability of one of its putative key personnel, and unequally permitted Vectrus to revise its proposal (post-award) by replacing that employee (Count VI); (10) conducted an arbitrary cost realism evaluation (Count VII); (11) made an arbitrary best value trade-off decision (Count VIII); and (12) improperly and unequally evaluated the proposals of [Alpha], [Juliet], and [Kilo] (Count IX).  Am. Compl. ¶¶ 130–289.

On September 28, 2021, all three parties filed their respective motions for judgment on the administrative record.  *See* ECF No. 35 ("Def. MJAR"); ECF No. 36-1 ("Pl. MJAR"); ECF No. 37 ("Intv. MJAR").  On October 25, 2021, the parties filed timely response briefs. *See* ECF No. 40 ("Def. Resp."); ECF No. 41 ("Pl. Resp."); ECF No. 42 ("Intv. Resp.").  On January 11, 2022, the Court held oral argument.  *See* ECF No. 50 ("Tr.").

## III.   JURISDICTION AND STANDING

The Tucker Act provides that an "interested party" may file an "action" in this Court "objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or [3] the award of a contract or [4] any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); *see also Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 84 & n.11 (2020); *Aero Spray, Inc. v. United States*, 156 Fed. Cl. 548, 559 & n.18 (2021) ("Section 1491(b) actions are typically referred to as 'bid protests.'").[13]

---

[13] *Cf. Tolliver*, 151 Fed. Cl. at 96–97 ("[A]lthough '[the Administrative Dispute Resolution Act ("ADRA")] covers primarily pre- and post-award bid protests,' the Federal Circuit in *RAMCOR* explicitly reversed this Court's determination 'that a [plaintiff] could only invoke § 1491(b)(1) jurisdiction by including in its action an attack on the merits of the underlying contract award' or the solicitation." (alteration in original) (quoting *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999))).

Thus, to establish standing in a bid protest action, a plaintiff must demonstrate that it is an "interested party." *Aero Spray*, 156 Fed. Cl. at 559 (explaining that "the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, 110 Stat. 3870[,] . . . defines not only this Court's jurisdiction over *what* actions may be brought against the government, but also *who* has standing to pursue them"). An "interested party" is "[1] an actual or prospective bidder or offeror [2] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (quoting 31 U.S.C. § 3551(2)).

In this case, neither the government nor Vectrus challenges IAP's standing or this Court's jurisdiction over IAP's amended complaint. Nevertheless, the Court has an independent duty to ascertain whether it possesses jurisdiction to decide IAP's claims and whether IAP has standing to pursue them. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of [the jurisdictional] doctrines.'" (alteration in original) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984))).

Having considered IAP's allegations in its amended complaint, the Court concludes that IAP qualifies as an interested party with respect to the procurement at issue; IAP has sufficiently alleged facts that, if proven based on the administrative record, demonstrate the requisite prejudice for the purposes of interested party status and jurisdiction. *See Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 226 (Fed. Cir. 2019) ("For standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions. . . . But once we find that a party has standing, we must turn to the merits of the party's claim and determine whether it can prove it was prejudiced based on the record evidence."); *see also James v. J2 Cloud Servs., LLC*, 887 F.3d 1368, 1372 (Fed. Cir. 2018) (courts reviewing a dismissal "for want of standing . . . must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party" (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))); *Blue Origin Fed'n, LLC v. United States*, 157 Fed. Cl. 74, 89 (2021) ("For the limited purpose of determining whether it has standing, a protestor's allegations are assumed to be true."); *Yang Enterprises, Inc. v. United States*, 156 Fed. Cl. 435, 444 (2021) ("The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry.").[14]

---

[14] The fact that a plaintiff may "successfully allege[] an injury (or prejudice) for standing purposes" — because if the plaintiff "succeeded on the merits . . . it would have a 'greater than an insubstantial chance of securing the contract'" — does not excuse a plaintiff from proving prejudice on the merits based on the administrative record. *Am. Relocation Connections*, 789 F. App'x at 227 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

## IV.   STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1491(b)(4), this Court applies the standard of review contained in the Administrative Procedure Act (APA) § 10(e), 5 U.S.C. § 706. *Nat'l Gov't Servs., Inc. v. United States*, 923 F.3d 977, 981 (Fed. Cir. 2019).  In particular, in accordance with the APA, this Court reviews an agency's procurement decisions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

In applying the APA standard of review, this Court affords considerable deference to an agency's procurement decisions.  *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (describing the arbitrary and capricious standard of review in bid protests as "highly deferential").  In particular, protests involving "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996).  Thus, in reviewing an agency's procurement decision, the Court shall merely "determine whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'"  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Accordingly, the Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citing *Colorado Interstate Gas Co. v. Fed. Power Comm'n*, 324 U.S. 581, 595 (1945)).  On the other hand, the Court will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated in the administrative record; *post hoc* explanations for agency decisions ordinarily will be rejected.

A plaintiff succeeds on the merits where it demonstrates, based on a trial on the administrative record,[15] that either:  "(1) the [agency]'s decision lacked a rational basis; or (2) the procurement decision involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332.  In addition, "to prevail in its bid protest, [IAP] must 'show a significant, prejudicial error in the procurement process,' meaning it must show that there is a *greater-than-insignificant chance*" that the Army would have awarded the contract to IAP "had [the Army] not committed the alleged errors."  *Am. Relocation Connections*, 789 F. App'x at 228 (emphasis added) (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (post-award protest)); *see also Info. Tech.*, 316 F.3d at 1319 ("the protestor's chance of securing the award must not have been insubstantial"); *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 265 (2021) (plaintiff must demonstrate that "but for the alleged error, there was a substantial chance that it would receive an award—that it was within the zone of active consideration" (alteration in

---

[15] *See Bannum*, 404 F.3d at 1354–56.

original) (quoting *Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1326 (Fed. Cir. 2011))).

## V.   DISCUSSION

With the exception of Count I, challenging the Army's decision not to make a competitive range determination and conduct discussions, the Court rejects IAP's claims either as unsupported by the administrative record or as a matter of law.

### A. The Army's Evaluation of IAP's Proposal Under the MS/TA Factor Was Consistent with the Solicitation and Reasonable (Count II.A)

IAP alleges that the Army's assignment of a deficiency to IAP on Subfactor 2 for inadequate OSP staffing in Iraq — which contributed to IAP's "Unacceptable" rating for the MS/TA factor — was arbitrary, capricious, or otherwise contrary to law.  Am. Compl. ¶¶ 159–184; Pl. MJAR at 12–14, 26–37; Pl. Resp. at 14–24.  Specifically, IAP argues: (1) the Army unfairly faulted IAP for following the RFP's instructions not to "mimic" the staffing requirements set forth in Technical Exhibit 2; and (2) IAP's proposed approach to OSP support met the PWS requirements.[16]  Am. Compl. ¶¶ 162, 165–177; Pl. MJAR at 12–14, 26–30; Pl. Resp. at 14–19.

Contrary to IAP's assertions, the Army's evaluation of IAP's proposal was rational and the assignment of the deficiency was well within the Army's discretion.  That is particularly true given that IAP's proposal failed to conform to the Solicitation's material OSP staffing requirements for Iraq.

---

[16] IAP presents three additional arguments in support of this count.  First, IAP argues that the deficiency finding is evidence of unequal treatment.  Am. Compl. ¶¶ 178–184; Pl. MJAR at 30–37; Pl. Resp. at 19–24.  This argument is addressed *infra*, Section V.E.  Second, IAP contends that "[t]he SSEB evaluation makes no reference to OSP Technicians, ISP Technicians, or Service Desk Support Specialists" in its report.  Pl. MJAR at 29; Pl. Resp. at 16.  The Court need not address this argument, as the Army is not required to "explicitly spell out [its] rationale or reasoning in perfect detail or clarity as long as [the Court] can discern the path the [Army] followed."  *Swagway, LLC v. Int'l Trade Comm'n*, 934 F.3d 1332, 1342 (Fed. Cir. 2019) (citing *Bowman Transp.*, 419 U.S. at 286).  Third, IAP alleges that the Army "materially narrowed" its concerns with IAP's proposal and "recast[] SSEB's findings" at the GAO to suggest that IAP's deficiency was solely attributable to IAP's approach to "unplanned" OSP work, thus "[t]acitly conceding that [the] SSEB's findings were erroneous."  Pl. MJAR at 5–6, 30 (citing AR 11963 (Army GAO Request for Partial Summary Dismissal)); Pl. Resp. at 14 n.13.  Even if this Court were inclined to read the Army's GAO argument in the same manner as IAP, there is no reason for this Court to consider such statements, as the contemporaneous record provides a reasonable and coherent account of the Army's decision.  *See Impresa*, 238 F.3d at 1332–33.

### 1. The OSP Support Requirements Are Material Terms of the Solicitation

FAR 15.305(a) provides that "[a]n agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation." In that regard, "a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations." *E.W. Bliss*, 77 F.3d at 448; *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) ("To be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals."). In other words, "an agency cannot award a contract to an offeror 'that did not meet the mandatory requirements of the solicitation.'" *DigiFlight, Inc. v. United States*, 150 Fed. Cl. 650, 657 (2020) (quoting Ralph C. Nash & John Cibinic, *Mandatory Solicitation Requirements: Can They Be Ignored?*, 15 Nash & Cibinic Rep. ¶ 40 (2001)); *see also Mangi Env't Grp., Inc. v. United States*, 47 Fed. Cl. 10, 17 (2000) ("[W]here a proposal is not compliant with the mandatory technical requirements of the solicitation, the proposal is unacceptable for award.").

A solicitation term is "material" where: (1) it is express in the solicitation; and (2) it serves a "substantive purpose." *ManTech Advanced Sys. Int'l, Inc. v. United States*, 141 Fed. Cl. 493, 506 (2019) (citing *Bus. Integra, Inc. v. United States*, 116 Fed. Cl. 328, 333–36 (2014)). A solicitation term serves a "substantive purpose" if it "is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." *Id.* Thus, "[a] proposal's failure to satisfy a material, or mandatory minimum, solicitation requirement is a material error." *DigiFlight*, 150 Fed. Cl. at 657.

To determine whether a solicitation requirement is "material," the Court must examine terms of the solicitation. *See DigiFlight*, 150 Fed. Cl. at 657.

The PWS included a comprehensive outline of an offeror's technical responsibilities with respect to OSP. AR 3797 (§ C.3.7.2). Specifically, it provided that the contractor would be responsible for "maintain[ing], repair[ing], and test[ing] customer equipment" and "maintaining the OSP infrastructure," including "communications pathways, maintenance hole cabling and hand holes, duct systems, copper and fiber optic cabling, main distribution frame, terminations of [c]opper and fiber optic cables, vaults, multiplexing equipment, cross connects system design and integration of systems to the OSP infrastructure and QA/QC of the OSP system." AR 3797–98 (§ C.3.7.2.1). Physical maintenance requirements associated with the OSP infrastructure included: (1) "install[ing], de-install[ing], maintain[ing], repair[ing] and test[ing] multiple-conductor aerial, underground, and buried multi-purpose communications cable to include coaxial, fiber optics, and copper/conventional cable";

22

(2) maintaining "telephone poles, manholes, handholds, outside terminals, pedestals, splice points, and bonding and grounding of termination points"; and (3) "fabricat[ing] fiber optic, metallic, or coaxial cables," among other things. AR 3798 (§ C.3.7.2.2). To accomplish these tasks, "[OSP] cable technicians shall operate digger derricks, bucket trucks, personnel lifts, backhoes, and trenching equipment to provide demand maintenance support." AR 3798 (§ C.3.7.2.2). Additional OSP responsibilities included conducting site surveys and obtaining and coordinating required OSP-related clearances and permits. AR 3798 (§§ C.3.7.2.3, C.3.7.2.4, C.3.7.2.5).

The RFP's Technical Exhibit 2 (Supported Locations) ("TE2") identified the mandatory minimum PWS coverage requirements by location, including required OSP support. AR 3919–45 (TE2). Specifically, TE2 provided that the Army requires OSP support ten hours per day, six days per week (Monday through Saturday, from 8:00 a.m. to 6:00 p.m.) at the five Iraq post/camp/site ("P/C/S") locations at issue here. AR 3939 (TE2) ("10/6=Requirement must be manned 10 hours per day, 6 days a week. M-SA 0800-1800"). While TE2 contained mandatory requirements, the Army *estimated* that it would need twelve (12) full-time equivalents ("FTEs") to provide the necessary OSP services in Iraq. AR 3980 (Attachment 8 – Staffing Estimate). To be clear, and as discussed in more detail below, while offerors were not required to propose the precise FTEs specified in Attachment 8, proposals *did* need to satisfy or otherwise explain how offerors would satisfy the minimum conditions specified in TE2.

Accordingly, the Solicitation clearly identified the OSP requirement, satisfying the first prong of this Court's test for materiality. *See ManTech*, 141 Fed. Cl. at 506.

As for the second prong, the Court finds that the OSP staffing requirements served a "substantive purpose," as it "is something important to the government's evaluation of the offer." *Id.* In this regard, the Solicitation specifically provides that "[a]ll items identified in Section L, paragraph L.8.2.B will be used to evaluat[e]" Subfactor 2, including "[t]he [o]fferor's approach to staff the effort (Section L, paragraph L.8.2.B.2)." AR 3117 (§ M.4.c). In turn, § L.8.2.B.2 explicitly identifies OSP support as one of the RFP's staffing requirements. AR 3962–63 ("The [o]fferor shall describe the proposed technical approach for performing the technical requirements set forth in the PWS, and are not limited to: . . . Capability to support operating, maintaining[,] and defending . . . Inside Plant/*Outside Plant* . . . ." (emphasis added)).

Because the Solicitation (1) clearly identifies the requirement, and (2) the requirement serves a "substantive purpose," the Court finds that the OSP staffing requirements are material. *See ManTech*, 141 Fed. Cl. at 506.

**2.   The Army's Assignment of a Deficiency to IAP Was Consistent with the Solicitation and the Minimum Requirements of Technical Exhibit 2**

IAP first argues that the Army's assignment of a deficiency to IAP for its OSP approach "contradict[s]" the RFP's terms.  Pl. MJAR at 26; Am. Compl. ¶¶ 103, 165–166. Specifically, IAP contends that the RFP instructed offerors to provide an "innovative" staffing approach and "expressly directed offerors not to mimic the staffing in TE2."  Am. Compl. ¶ 103 ("The [Army] appears to have assigned this deficiency because IAP purportedly did not staff 'in accordance with TE2,' but the Solicitation expressly directed offerors not to mimic the staffing in TE2.").[17]  Thus, according to IAP, the Army may not penalize IAP and assign a deficiency where IAP was simply following the RFP's instructions.   Am. Compl. ¶ 166 ("Following the Solicitation instructions cannot reasonably be grounds for a deficiency."); Pl. MJAR at 29 ("The Army could not, as it did here, warn against mimicking the staffing estimates and then assign IAP a deficiency because it did just that.").

This argument fails for two reasons.  First, while IAP is correct that the Army encouraged offerors to provide an "innovative" solution,[18] the RFP did not permit such innovation at the expense of meeting basic, material PWS requirements.  Second, IAP is *incorrect* in its assertion that the RFP warned offerors not to "mimic" the figures in TE2. On the contrary, as discussed above, the data listed in TE2 are *minimum requirements* that must be met by an offeror.  AR 3919–45 (TE2); *see also* AR 3823 (§ C.4.4) ("The [c]ontractor shall provide staffing to accomplish the requirements of the PWS.   Normal hours of operation for each site *are specified in TE 2*." (emphasis added)); AR 3824 (§ C.4.6) ("The [c]ontractor shall provide support in Southwest and Central Asia locations *as specified in the TE2*." (emphasis added)); AR 3757 (§ B.5.e) ("The proposed labor categories and rates shall represent the appropriate loadings for specific site and countries *as associated with the requirements presented in [the PWS] and the TE2*.").  In contrast, the RFP *did* expressly warn offerors not to "merely mimic[]" the workload estimates *in Attachments 8 and 9*.  AR 3963 (§ L.8.2.B.2) ("Government Estimated Staffing and Workload Data is provided in Section J, Attachment 8 and Attachment 9.   The Government Estimated Manning is an estimated full-performance manning; [o]fferors should refrain [from] merely mimicking the estimated manning[] and propose an innovative staffing solution based off workload data."); *see also* AR 3718 (RFP Amendment 0003, Section A – RFP Questions/Answers) ("[Attachment 8] and [Attachment 9] represent different estimates from the government

---

[17] *See also* Pl. MJAR at 29 ("[T]he SSEB . . . faulted IAP for proposing centralized teams to perform OSP services instead of mimicking the staffing estimates set forth in Technical Exhibit 2 ("TE2"). . . . The RFP repeatedly instructs offerors to 'propose an innovative staffing solution' and to '*refrain merely [from] mimicking the estimated manning*.'" (alteration in original) (citation omitted)).

[18] *See* AR 3963 (§ L.8.2.B.2) (advising offerors to "propose an innovative staffing solution based off workload data").

24

produced at different times.  They are not intended to be an [o]fferor's solution, rather examples of possible solutions.").

Thus, the Army in the RFP expressly distinguished between, on the one hand, Attachments 8 and 9 — which merely contained estimates for offerors' consideration — and, on the other hand, the technical exhibits, which contained minimum requirements. For example, in responding to an offeror's question, the Army articulated that "[t]he [o]fferor shall propose [its] solution *based on the requirements in the PWS and throughout the solicitation (TEs, etc[.]), not as a regurgitation of either [Attachment 8] or [Attachment 9].*" AR 3718 (emphasis added); *see also* AR 3740 ("Question: The number of FTEs in [Attachment 8] and the locations of the FTEs are substantially different than the number of slots per location as identified in the [Attachment 9].  Will the [government] confirm it prefers use of the TE2? . . . Answer[:] [Attachment 8] is the [g]overnment *estimate* for personnel. [Attachment 9] provides 1yr [sic] of Workload Data, and [t]he *TE-2 outlines the requirement*, PWS para [sic], Security clearance level, IT/IAT/IAM level, *locations and workweek requirement.*" (emphasis added)).

In sum, IAP improperly conflates the Solicitation's warning to offerors not to mimic the staffing estimates and workload data contained in Attachments 8 and 9 with the requirements in TE2 — all in an attempt to persuade the Court that IAP's proposal was "innovative" and complied with the Solicitation's requirements, when in fact it did not.  The TE2 requirements were not optional; offerors were required to meet the mandatory staffing requirements listed in TE2 for each location.  The failure to do so constitutes a material error and grounds for disqualification — or at the very least a deficiency, as the Army assigned here.

### 3.  The Army Reasonably Determined that IAP's Proposal Failed to Meet Material OSP Support Requirements

IAP further argues that the Army "misread[]" its proposal and maintains that its proposal meets the PWS requirements and offers sufficient OSP support in Iraq.  Am. Compl. ¶¶ 102, 104 (arguing that the Army "ignore[d]" IAP's "proven" solution to provide OSP support in "all contract locations"); Pl. MJAR at 26–28; Pl. Resp. at 14–18. The Court finds this argument unpersuasive.  IAP mischaracterizes its proposal; it is readily apparent that IAP's proposed OSP staffing approach fails on a basic level to meet the RFP's requirements for OSP support in Iraq.

The relevant details of IAP's approach to OSP staffing in Iraq is contained in IAP's narrative and its staffing matrix.  AR 4359–61, 4381–82 (IAP Proposal, Volume 2 – Mission Support/Technical Approach).

Specifically, IAP described its OSP approach as follows:

> **2.2.3.5 Capability to Support OMD of Inside Plant / Outside Plant / Cabling**
>
> . . . .
>
> 2.2.3.5.3 Operate.  *[IAP] centralizes the teams [ * * * ] where travel and movement make that practical.  [ * * * ] or we combined ISP personnel with switch operators where applicable. [ * * * ].  [ * * * ] we use a Network Administrator to assist with work alongside the OSP Teammate if maintenance or repairs require a two-person team for safety. . . .*
>
> . . . [ * * * ].  *Our plan is to centralize the teams, and deploy them on schedule (for inspections), or as needed based on requirements [ * * * ]. . . .*

AR 4359–61 (emphasis added).

While this narrative indicates that IAP proposed "centralize[d] . . . teams [ * * * ]" to provide ISP and OSP support, IAP provided no additional details to explain or support this approach.  IAP does not explain the composition of these teams (*i.e.*, who they are), where *specifically* these teams will provide support (*i.e.*, where they are located), or how these centralized teams or consolidated positions will timely meet the required on-site OSP support detailed in TE2.  *See* AR 3963 (§ L.8.2.B.1) ("The [o]fferor's approach *shall demonstrate an understanding of the technical requirements to provide support* for the identified services listed in [the PWS] . . . *and Technical Exhibits*." (emphasis added)).[19]

IAP's staffing matrix further fails to adequately supplement IAP's narrative to provide the necessary details regarding how its "centralize[d]" teams would meet the

---

[19] IAP further argues that the SSEB erroneously faulted IAP for "not identify[ing] the regions where [the centralized] teams would provide [OSP] support" in Iraq.  Pl. MJAR at 27 (first alteration in original) (quoting AR 9348 (SSEB Initial Report)); Am. Compl. ¶ 167; Pl. Resp. at 14–15.  Specifically, IAP argues that "contrary to the evaluation," IAP sufficiently proposed OSP support "in all contract regions," including Iraq.  Pl. MJAR at 13–14.  In support of this assertion, IAP points to scattered statements in various *other* sections in its proposal as evidence that it meets the OSP services requirements.  *See, e.g.*, AR 4357 ("[ * * * ]."); AR 4372 (proposing "[ * * * ]," which "[ * * * ]").  The Court finds such scattered and generalized statements insufficient to rebut the Army's central findings.  *See Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 787 (2009) ("As a corollary of the principle that proposals must meet the requirements of a solicitation, blanket statements that an offeror will meet or exceed them have been found to be noncompliant." (citing *Int'l Outsourcing Servs., L.L.C. v. United States*, 69 Fed. Cl. 40, 49 (2005))).  If anything, these statements constitute further evidence of IAP's inadequate approach.

required OSP support at each Iraq location.[20]  If anything, IAP's staffing matrix reveals significant "capability gap[s]" in its OSP staffing approach.  *See* AR 9348 (SSEB Initial Report) (explaining that IAP's failure to propose sufficient OSP support "creates a capability gap to support the OSP infrastructure at P/C/S level within Iraq").  For example, in its staffing matrix, IAP proposed to "consolidate" certain roles.  AR 4372 (proposing "[ * * * ] consolidation of ISP/OSP teams for most tasks"); *see also* Tr. at 127:11–13 ("[IAP'S COUNSEL]: . . . If you flip through the staffing plan, the whole proposal is premised on consolidation of labor categories.").  In other words, rather than propose dedicated, locally-based personnel for each labor category in its staffing matrix, IAP *combined* various positions; that is, the duties of certain labor categories were assigned to FTEs of *another* labor category.

In IAP's staffing matrix,[21] IAP listed proposed labor categories, with corresponding columns indicating the location, number of FTEs per contract period, shift coverage, hours per week, work days, and duty hours.  AR 4374–94.  In addition to these required columns, IAP included two additional columns — "Job Code" and "Job Code Assignment Override."  AR 4374–94.  This "Job Code Assignment Override" column indicates which alternate labor category will assume the duties of the original labor category.

---

[20] To be clear, the Army has no objection *per se* to an offeror's proposing centralized OSP support [ * * * ].  Indeed, the Army implicitly indicated that such an approach is permissible, *so long as it complies with the PWS and TE2 requirements*.  For instance, one of the questions submitted to the Army concerning the draft RFP asked: "When a location has a hours/days metric associated to a PWS element, is it required that the personnel providing this task coverage are physically located at the individual locations listed or is it acceptable for some of this support to be provided via reach back to RNOSC/SWACC?"  AR 2340 (Draft RFP Questions & Answers).  The Army responded, "[n]o, as long as services are provided [in accordance with] the PWS and TE[s]."  AR 2340.  In a follow-up question, a prospective offeror asked: "The answer implies that *a regionalized support approach is acceptable*. . . . Are there any constraints to providing operations support from locations beyond the RNOSC/SWACC, that is, from any site within the same geographical location or country?  Are there any PWS areas where this approach is not acceptable?"  AR 3736–37 (emphasis added).  In response, the Army answered, again, "[n]o, as long as services are provided [in accordance with] the PWS and TE[s]."  AR 3737 (RFP Amendment 0003).

[21] The Court would be remiss if it did not recognize Vectrus's exemplary presentation in its MJAR of the RFP's instructions concerning TE2, OSP support, and the staffing matrix.  Vectrus's briefings explain in clear, simple terms the nuances of the OSP staffing requirements and presented a clear breakdown of IAP's staffing matrix, revealing its deficiencies.  *See, e.g.*, Intv. MJAR at 4–9.  In that regard, the Court's discussion here generally tracks that presented in Vectrus's briefs and adapts two of its tables.

For example, IAP's staffing matrix listed the following for the Network Administrator position at the Al Asad location in Iraq:

| Labor Category | FTE 8M (P3) | FTE OY1 (P4) | Job Code | Job Code Assignment Override |
|---|---|---|---|---|
| Network Administrator | [ * * * ] | 0 | C.3.4.3.1IRAL-106-303 | C.3.2.3.1IRRN-106-333 [Network Engineer Elite, RNOSC] |

AR 4381.  Thus, for the Al Asad location, IAP proposed no on-site Network Administrator after the base period; rather, the duties of the Network Administrator in Al Asad would be assumed by the Network Engineer Elite at the RNOSC location in Iraq.

For OSP support, IAP's staffing matrix included the "Outside Plant (OSP) Technician" labor category at various TE2 locations in southwest Asia and central Asia. AR 4374–85, 4387, 4393–94.  For some locations, including Iraq, IAP proposed zero FTEs for the OSP Technician labor category.  *See, e.g.*, AR 4375 (proposing zero FTEs for OSP Technician in [ * * * ]).  For all these locations *except Iraq*, the staffing matrix indicated that the duties of the OSP Technician would be assumed by an ISP Technician at the same location.  *See, e.g.*, AR 4385 (indicating that the duties of the OSP Technician in [ * * * ] would be assumed by the ISP Technician in the same location).  For the locations in Iraq, IAP's staffing matrix indicated that the Service Desk Support Specialist ("SDSS") labor category would assume the duties of the OSP Technicians:

| Labor Category | TE2 Site/Location | FTE 2M (P1) | FTE 2M (P2) | FTE 8M (P3) | FTE OY1 (P4) | FTE OY2 (P5) | FTE OY3 (P6) | FTE OY4 (P7) | Job Code Assignment Override |
|---|---|---|---|---|---|---|---|---|---|
| Outside Plant (OSP) Technician | AL ASAD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | C.3.4.3.4IRAL-247-1239 [Service Desk Support Specialist, AL ASAD] |
| Outside Plant (OSP) Technician | BDSC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | C.3.4.3.4IRBD-247-1224 [Service Desk Support Specialist, BDSC] |
| Outside Plant (OSP) Technician | ERBIL | 0 | 0 | 0 | 0 | 0 | 0 | 0 | C.3.4.3.4IRER-247-1233 [Service Desk Support Specialist, ERBIL] |
| Outside Plant (OSP) Technician | FOB UNION 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | C.3.4.3.4IRFO-247-1230 [Service Desk Support Specialist, FOB UNION 3] |

| Outside Plant (OSP) Technician | TAJI | 0 | 0 | 0 | 0 | 0 | 0 | 0 | C.3.4.3.4IRTA-247-1236 [Service Desk Support Specialist, TAJI] |
|---|---|---|---|---|---|---|---|---|---|

AR 4381–83.

While IAP argues that "[a]ssigning personnel a new labor category does not equate to a lack of support," Pl. MJAR at 29, IAP's proposed reassignment of the OSP support duties to the SDSS labor category (as indicated in the "Job Code Assignment Override" column, above) is problematic for several reasons.

*First*, IAP's *own description* of the SDSS labor category did not include *any* of the necessary qualifications or skills required for OSP support. *Compare* AR 4568–69 (IAP's labor category description of SDSS in Al Asad, Iraq), *with* AR 4505–06 (IAP's labor category description of OSP Technician in Al Asad, Iraq). While the ISP Technician labor category differs from the OSP Technician labor category, such differences are (presumably) marginal and it is conceivable that an ISP Technician has the qualifications or skills to execute the duties of an OSP Technician. In contrast, the skillsets of an SDSS and an OSP Technician differ significantly. As succinctly explained by Vectrus in its MJAR, "the job (and qualifications required) of an OSP Technician on [the OMDAC-SWACA] contract is comparable to that of a lineworker for a telecommunications company," and "is a very physically demanding position, which requires specific training and education." Intv. MJAR at 10. On the other hand, "the job (and qualifications required) of a SSDS on this contract is a desk-job comparable to that of a customer service/help desk representative for a telecommunications company," and entails "entirely different training[] and does not require the same physical ability to perform." *Id.* at 10–11. Thus, assigning the duties of an OSP Technician to an SDSS, a labor category with inadequate training and qualifications to carry out the OSP support duties, is insufficient and does not meet the PWS requirements for OSP support. *See* AR 9112–15 (MS/TA Draft ENs).

*Second*, IAP failed to demonstrate how these "combined" SDSS positions in Iraq meet the minimum coverage requirements prescribed in TE2. As noted above, TE2 indicates that the Army requires OSP support in Iraq from Monday through Saturday from 8:00 a.m. to 6:00 p.m. AR 3939 (TE2). On the other hand, the Army requires Help Desk support (what IAP labels as SDSS) twenty-four hours per day, seven days per week in Iraq. AR 3939. IAP's proposal may be creative, and it may result in cost savings, but it does not comply with the mandatory requirements. In particular, IAP proposed to divide the SDSS labor category in Iraq into three shifts, consisting of one [ * * * ] shift on Saturday through Wednesday from [ * * * ], a second [ * * * ] shift on [ * * * ] from [ * * * ], and a third [ * * * ] shift on [ * * * ] from [ * * * ]. AR 4381–83 (IAP Staffing Matrix). IAP further proposed that the OSP Technician duties in Iraq would be assumed by SDSS staff

29

working the *first* shift — Saturday through Wednesday from [ * * * ].  AR 4381–83.  This approach is in direct contravention of the express coverage requirements specified in TE2 for OSP support in Iraq — a requirement of *six* days a week, *Monday through Saturday.* AR 3939 (TE2).  This Court cannot square IAP's repeated assertions that the Army "misread" its proposal with the plain facts.  The RFP quite clearly specified in TE2 the days of the week for which the Army required OSP support in Iraq.  And, the RFP unambiguously required that "[o]fferors must clearly demonstrate their ability to meet all requirements specified in [the] solicitation."  AR 3114 (§ M.1.A).  IAP failed to meet that instruction.[22]

Finally, IAP asserts that the SSEB erroneously reported that IAP proposed to remove all Network Administrators from Iraq.  Am. Compl. ¶¶ 175–176; Pl. MJAR at 28– 29; Pl. Resp. at 16, 18.  Specifically, IAP contends that the following excerpt from the SSEB's deficiency finding is false: "[IAP]'s approach increases the risk of unsuccessful contract performance to an unacceptable level because — . . . [a]lthough [IAP] proposed that [Network Administrators] would provide the OSP support, [IAP] removed the [Network Administrators] at all locations in Iraq (Volume 2, paragraph 2.2.11, page Vol. 2 - 85)."  AR 9348 (SSEB Initial Report).

---

[22] This Court also takes issue with IAP's presentation at oral argument that, in the Court's view, mischaracterized IAP's proposal.  In particular, IAP presented a demonstrative PowerPoint slide deck depicting a putative sample page of IAP's staffing matrix for Iraq.  IAP's demonstrative, however, omitted columns from the actual staffing matrix that detailed proposed hours per week, work days, and duty hours, but included the column for shift coverage.  The effect was to lead the Court to believe that coverage requirements specified in TE2 would be met, when in actuality there were large gaps.  IAP, for example, showed the Court references to putative 24/7 coverage for the SDSS labor category, which, according to IAP's counsel, met the need for OSP coverage.  In reality, however — as evident in IAP's proposal (as opposed to the demonstrative) — IAP was missing required OSP coverage.  This misdirection was corrected by counsel for Vectrus via an objection during oral argument.  The Court agreed with Vectus then and continues to do so. Tr. 125:16–25, 126:6–9, 128:22–129:2, 129:7–8, 14–21, 129:24–130:1 ("[IAP'S COUNSEL]: Here's a pull-out of a chart describing the work breakdown to an ISP and OSP in the region. . . . [W]e are absolutely addressing the PWS requirement in the proposal.  We have a whole labor category just called outside plant technician in Iraq.  We have different labor categories for OSP in each country.  There is one in Iraq. . . . We had in our staffing plan an OSP technician listed in Iraq. . . . [I]f you follow over to the far right column, job code assignment override, you can see that it aligns with the job code for a service desk support specialist, where we do have FTEs. . . . THE COURT: . . . How about the work days only being five days a week instead of six?  Is it true that six days a week were required?  [IAP'S COUNSEL]: Your Honor, I think you can see on the page that [we] are shifting from someone who is 10/6 to 24/7 . . . . [A]s you can see, OSP technician on the bottom there, TE-2, shift coverage, 10/6. . . . We're moving to someone who's 24/7.  [VECTRUS'S COUNSEL]: Your Honor, may I object?  This is a complete misrepresentation of this document.  It is missing the days and the hours that that person would work.  THE COURT: Yeah.  I have a totally different document . . . . It's [on] [AR] 4381.  It says, 'Workdays, service desk support specialist, Saturday, Sunday, Monday, Tuesday, Wednesday.'").

This assertion is flatly contradicted by IAP's staffing matrix. As mentioned above, IAP's narrative indicated that at "smaller locations," like those in Iraq, a Network Administrator would "assist with [OSP] work alongside the OSP Teammate if maintenance or repairs require a two-person team for safety." AR 4360. IAP, in its staffing matrix, listed "Network Administrator" in various locations throughout Iraq but proposed to *remove them after the base period*. AR 4381–82 (proposing zero Network Administrator FTEs in Al Asad, BDSC, Erbil, FOB Union 3, and Taji after the base period). Instead, like the OSP Technicians, the duties of the Network Administrator would be assumed by various network *engineering* positions at the RNOSC-I location in Iraq. AR 4381–82. While such a reassignment of duties may not *by itself* present a problem, given the other problems with IAP's proposed OSP support in Iraq — *and* that IAP's narrative indicated that the Network Administrators would provide much-needed OSP support — the SSEB reasonably concluded that that their removal would increase the risk of unsuccessful performance. AR 9348. That conclusion is particularly reasonable given that IAP failed to explain how the network engineering positions at the RNOSC-I location, for example, would be able to provide the necessary OSP support for other locations in Iraq in addition to meeting their own duties at RNOSC-I. Thus, the SSEB's finding concerning Network Administrators was not erroneous and, accordingly, this Court has no grounds to disturb that determination.

In sum, neither IAP's technical narrative nor its staffing matrix proposed adequate OSP staffing coverage in Iraq, despite IAP's assertions to the contrary. IAP simply has not "demonstrated, that [the Army's] findings are unsupported by the administrative record or inconsistent with the evaluation criteria." *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 660 (2002), *aff'd*, 56 F. App'x 474 (Fed. Cir. 2003). Rather, IAP "offers little more than mere disagreements with the [Army's] overall assessment of the adequacy of its proposal." *Id.* Thus, this Court finds that "[s]uch naked claims, by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious." *Id.*

Accordingly, the Army did not act arbitrarily in determining that IAP's approach to OSP support materially failed to meet the RFP requirements. The Army's assignment of a deficiency to IAP on Subfactor 2, and rating IAP as overall "Unacceptable" on the MS/TA factor, was well within the Army's discretion, and, in this Court's opinion, likely correct as a factual matter (*i.e.*, if this Court were to review the assessment *de novo*). *See E.W. Bliss*, 77 F.3d at 449; *see also Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 596 (2006) (explaining that "the proper role of courts" does not include "second guessing the technical judgments of evaluators").

**B. The Army Acted Within Its Discretion in Finding that Vectrus Complied with the Solicitation's ITIL Requirement (Count III)**

Next, IAP argues that the Army's contract award to Vectrus was arbitrary and capricious because Vectrus failed to comply with the Solicitation's Information Technology Infrastructure Library ("ITIL") Foundation certification requirement (the "ITIL Requirement"). Am. Compl. ¶¶ 207–215; Pl. MJAR at 23–26; Pl. Resp. at 9–14 (alleging that the Army "ignored" Vectrus's "fail[ure] to satisfy" the ITIL Requirement).[23] This argument fails, however, as the Army acted within its discretion in finding that Vectrus met the ITIL Requirement.

In addressing IAP's allegations concerning the ITIL Requirement, the Court begins with the pertinent clause of the RFP, which provides as follows:

> C.4.21 Information Technology Infrastructure Library (ITIL). The [c]ontractor shall be Foundation certified on the most current version of [ITIL] and have experience in the use of the ITIL framework for IT service management for designing, developing, and implementing service management best practices for the service lifecycle, business process modeling, IM/IT, network operations center, help desk operations, and telecommunications/information processing, IT networking (LAN/WAN), messaging services, configuration management, and maintenance support. This certification is only critical to upper echelon key management and regional management positions ([i.e.], Program Manager and Country Managers). Personnel must be certified upon contract start date.

AR 3831 (§ C.4.21) (emphasis omitted). Offerors were required to identify in their labor categories descriptions chart that their Program and Country Managers would have the necessary ITIL certification. AR 3964 (§ L.8.2.B.3) (instructing offerors to identify "certifications for each labor category proposed (to include Project Manager, Country Managers, or Site Managers/Site Lead Technicians)" and "demonstrate that proposed labor categories include . . . applicable certifications").[24]

---

[23] IAP also alleges that [Juliet] and [Kilo] likewise failed to meet the ITIL Requirement. Am. Compl. ¶¶ 207–215; Pl. MJAR at 23–26; Pl. Resp. at 9. The Court need not address these offerors' compliance with the ITIL Requirement, however, as IAP cannot demonstrate that it was prejudiced by any such errors in light of this Court's resolution of IAP's other claims.

[24] Apparently, the RFP used the titles "Program Manager" and "Project Manager" interchangeably. *See* AR 3147 (defining the acronym "PM" as "PROGRAM MANAGER or PROJECT MANAGER").

IAP's argument concerning the ITIL Requirement is twofold.[25]  First, IAP asserts that the word "critical" in this provision indicates that the ITIL Requirement is "material"; that is, the failure to comply with this requirement automatically results in the disqualification of an offeror's proposal from consideration.  Am. Compl. ¶ 209; Pl. MJAR at 23; Pl. Resp. at 9.  Second, IAP contends that only ITIL Foundation version 4 certification constitutes "the most current version" of ITIL at the time of proposal submission, and offerors were required to expressly represent in their proposals that their personnel possessed ITIL version 4 certification.  Am. Compl. ¶¶ 210, 211; Pl. MJAR at 24; Pl. Resp. at 11–12.  Based on these two grounds, IAP avers that Vectrus "failed to satisfy the RFP's material ITIL Version 4 certification requirement," and, thus, Vectrus's proposal is "noncompliant" and "ineligible for award."  Pl. MJAR at 23–24.  The Court finds neither of IAP's arguments persuasive.

*First*, the mere use of the word "critical" does not make a solicitation term inherently material.  As discussed above, a solicitation term is material where it is express in the solicitation and serves a "substantive purpose." *ManTech*, 141 Fed. Cl. at 506.  While the Solicitation delineated the ITIL Requirement, this Court finds that it does not serve a "substantive purpose," as it is not a term that is "important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." *Id.*  There is certainly no RFP language making the ITIL Requirement a mandatory minimum comparable to the language at issue in *DigiFlight* or *WaveLink*. *See DigiFlight*, 150 Fed. Cl. at 658 (finding "mandatory minimum requirement" where "the [s]olicitation expressly warned offerors that failure to comply with the requirement would lead to an outright rejection of the proposal"); *WaveLink*, 154 Fed. Cl. at 272–73 (finding a solicitation's requirement constituted "mandatory [s]olicitation provisions that the [a]gency was not free to ignore" because the solicitation "plain[ly]" and "unambiguous[ly]" stated that an offeror "would not be eligible for award" if it failed to do so).

*Second*, even if the ITIL Requirement is material, the ITIL Requirement applied not at the time of proposal submission but rather "*upon [the] contract start date*."  AR 3831 (§ C.4.21) (emphasis added).  As explained by the United States Court of Appeals for the Federal Circuit,

> [w]here an offeror has certified that it meets the technical requirements of a proposal, the Contracting Officer is entitled to rely on such certification in determining whether to accept a bid, and the offeror's potential failure to comply with the proposal requirements is ordinarily "a matter of contract administration," which does not go to the propriety of accepting the bid. *See Centech*, 554 F.3d at 1039 . . . . "However,

---

[25] IAP offers a third argument involving unequal treatment.  *See* discussion *infra* Section V.E.

where a proposal, *on its face,* should lead an agency to the conclusion that an offeror could not and would not comply with the [applicable requirement], we have considered this to be a matter of the proposal's technical acceptability," which *does* affect the propriety of accepting the offer. *Id.* (emphasis added); *see also In re Spectrum Sys., Inc.*, B–401130, 2009 WL 1325352, at *2 (G.A.O. May 13, 2009) ("[A]n agency may accept a quotation's representation that indicates compliance with the solicitation requirements, where there is no significant countervailing evidence reasonably known to the agency evaluators that should create doubt whether the offeror will or can comply with the requirement."). The proper framing of the acceptability of [the offeror]'s proposal is, therefore, whether the "generally compliant with exceptions" language in [the offeror]'s proposal constitutes "significant countervailing evidence reasonably known to the agency evaluators that should create doubt whether the offeror will or can comply with the requirement." *Spectrum,* 2009 WL 1325352, at *2.

*Allied Tech. Grp.,* 649 F.3d at 1330–31 (second alteration in original) (footnote omitted). Accordingly, the ITIL Requirement is primarily a matter of contract administration and, thus, the Court may examine only whether Vectrus's "proposal, on its face, should lead [the Army] to the conclusion that [Vectrus] could not and would not comply with" the Solicitation's terms. *Centech,* 554 F.3d at 1039 (quoting *Orincon Corp.*, B-276704, 97-2 CPD ¶ 26, 1997 WL 402081, at *3 (Comp. Gen. July 18, 1997)).[26]

The Court finds that nothing contained in Vectrus's proposal should have led the Army to conclude that Vectrus could not, or would not, comply with the ITIL Requirement upon the contract start date, as required. *See id.* Vectrus did not take exception to the ITIL Requirement; rather, Vectrus provided all the information required by the RFP for the requirement. Vectrus clearly represented in its labor categories descriptions chart, as required by the RFP, that its Project Managers and Country Managers would be ITIL Foundation certified. AR 8067–68 (Vectrus Proposal, Volume 2 – Sub-Factor 2 Technical Approach) (listing "ITIL Certification" as a required certification for Country Manager and Project Manager).

---

[26] The government argues that the Court lacks jurisdiction to address this argument because it involves contract administration. Def. MJAR at 37–38. Because IAP frames the issue as one related to Vectrus's alleged noncompliance with the RFP, the Court decides the issue on the merits. The result is the same, however — IAP does not prevail here.

*Third*, to the extent that IAP alleges that offerors were required to *explicitly* identify "the most current version of [ITIL]" in their proposals — which, according to IAP, means version 4 — nothing in the record supports that argument. The RFP merely required that offerors' Program and Country Managers be ITIL Foundation certified, *in the most current version*, upon contract start date. AR 3831 (§ C.4.21). No provision in the RFP indicated that offerors were required to specify *which* version of ITIL Foundation certification its personnel possessed or project what the most current version would be at a future point in time.[27] Nevertheless, IAP argues that Vectrus's proposal is "noncompliant" because Vectrus's labor categories descriptions chart merely indicates that its Project and Country Managers would be "ITIL Foundation" certified and not specifically certified in "*ITIL version 4*." Pl. Resp. at 10–12. The Court concludes, however, that offerors were not required to identify in their respective proposals which version of ITIL certification their personnel would possess.

Relatedly, IAP errs in arguing that Vectrus's proposal is "noncompliant" because Vectrus allegedly represents in its proposal that its personnel will be certified *only* in ITIL version 3 , and *not* ITIL version 4. Am. Compl. ¶¶ 212, 215; Pl. MJAR at 24; Pl. Resp. at 11. In support of this argument, IAP points to various statements in Vectrus's narrative as "evidence" of Vectrus's noncompliance, including representations such as "[w]e implemented ITSM best practices based on the ITIL v3 framework," and "[w]e provide an . . . experienced, in-place leadership team of ITILv3 Foundation-certified managers." AR 7965, 7967 (Vectrus Proposal, Volume 2 – Sub-Factor 1 Management). IAP's argument fails for a simple reason — as explained above, none of Vectrus's representations in its proposal amount to an affirmative assertion that Vectrus *will not* meet the ITIL Requirement. In fact, each of Vectrus's aforementioned statements in its proposal are either in the present tense or the past tense, which is eminently understandable considering that *Vectrus is the incumbent contractor*, a fact conveniently overlooked by IAP. Thus, reading these representations in the context of Vectrus's position as the *current provider of these services*, these statements are merely a recitation of what Vectrus was providing the Army in support of the ongoing OMDAC-SWACA contract *at the time Vectrus submitted its proposal*. Given this context and the nature of the RFP's requirement, only a statement disclaiming an intent to provide the most current version of the

---

[27] Notably, which version of ITIL Foundation certification is the "most current version" appears to be an ever-evolving designation. At the time the RFP was issued, ITIL version 3 was the latest version of the certification. Def. MJAR at 39; Intv. MJAR at 38. In February 2019, however, a mere few months before proposals were due, ITIL version 4 was released. *See* Am. Compl. ¶ 210 n.4; Def. MJAR at 39; Intv. MJAR at 38; Def. Resp. at 18 n.6. Nevertheless, ITIL version 3 remained current until July 2021. *See* Def. MJAR at 39 (citing *AXELOS announces discontinuation of ITIL v3*, Axelos (Jan. 6, 2021), https://www.axelos.com/news/axelos-announces-discontinuation-of-itil-v3). In any event, even if IAP is correct and ITIL version 4 is *now* "the most current version," the Court need not definitively resolve this issue because, as discussed above, the RFP does not require an offeror's personnel obtain such certification *until the contract start date*. *See* AR 3831 (§ C.4.21).

certification at the time of contract award (or, more accurately, the start date) could be disqualifying.  Vectrus's proposal does not suffer from such a defect.

Accordingly, IAP's argument concerning the ITIL Requirement is without merit, as nothing in the record indicates that Vectrus's proposal took exception to the requirement that its Program and Country Managers must be certified with the most current version of ITIL upon contract start date.

### C.  Vectrus Did Not Misrepresent the Availability of Its IT Service Management Subject Matter Expert (Count VI)

IAP contends that the Army improperly overlooked Vectrus's failure to notify the Army of the departure of one of its proposed "key personnel," Mr. [NS], and engaged in unequal "post-award discussions" with Vectrus when the Army permitted Vectrus to replace Mr. [NS] after contract award.  Am. Compl. ¶¶ 241–260; Pl. MJAR at 42–48; Pl. Resp. at 25–29.  Essentially, IAP claims that Vectrus engaged in a "bait and switch."  In general, a "bait and switch" occurs when "an awardee proposes certain key personnel, then substitutes them for other individuals post-award." *Conley & Assocs., Inc. v. United States*, 142 Fed. Cl. 177, 182 (2019); *see also Unified Architecture & Eng'g, Inc. v. United States*, 46 Fed. Cl. 56, 64 ("The term 'bait and switch' generally refers to an offeror's misrepresentation in its proposal of the personnel that it expects to use during contract performance."), *aff'd*, 251 F.3d 170 (Fed. Cir. 2000); *Prot. Strategies, Inc. v. United States*, 76 Fed. Cl. 225, 235 (2007) ("The crux of a bait and switch claim is the government's reliance on a misrepresentation by a successful bidder, which effectively changes the term or terms of the underlying solicitation.").

As discussed below, the Court finds that IAP's bait and switch claim fails for at least four reasons:  (1) Vectrus did not identify Mr. [NS] for a key personnel position as contemplated by the RFP; (2) even if Vectrus had identified Mr. [NS] for a key personnel position, there is no evidence that Vectrus had advance knowledge of Mr. [NS]'s intended departure at the time of proposal submission; (3) there is no evidence that the Army relied on the availability of Mr. [NS] in evaluating Vectrus's proposal; and (4) Vectrus had no obligation to notify the Army of Mr. [NS]'s departure prior to award.

### 1.  Vectrus Did Not Propose Mr. [NS] for a Key Personnel Position

As mentioned above, IAP alleges that Mr. [NS] was one of Vectrus's proposed key personnel.  This assertion, however, is incorrect.

The Solicitation required offerors to include in their proposals certain "key personnel."  AR 3961–64 (§ L.8.2).  In that regard, the RFP designated only four key personnel positions:  (1) "Project Manager"; (2) "Country Manager"; (3) "Site Manager"; and (4) "Site Lead Technicians."  AR 3838 (§ H.1.a).  Critically, however, the Solicitation

did not require offerors to identify their proposed key personnel by name.  Indeed, the RFP specifically instructed offerors "not [to] provide resumes" as part of their proposals.  AR 3964 (§ L.8.2.B.3).  Additionally, the Solicitation did not require any documentation, such as letters of commitment, assuring the continued availability of key personnel.

Instead, the Solicitation only required offerors to be prepared to identify their key personnel *after* contract award:

> Within ten days of notification of contract award, the contractor shall provide the names[] and resumes of all designated Key Personnel to the [Contracting Officer's Representative].  Key Personnel identified at the beginning of phase-in must have the same or greater experience and qualifications as those presented in the contractor's proposal.  During contract performance, the contractor shall provide written notification to the contracting officer at least 30 days prior to making any changes to Key Personnel.  The written notification shall include copies of the resumes and Certifications of any individuals proposed as replacements to Key Personnel.   Individuals with equal or higher qualifications and experience must be provided.

AR 3838 (§ H.1.b).

In Vectrus's proposal, Vectrus identified Mr. [NS] as its IT Service Management Subject Matter Expert ("ITSM SME").  AR 7968.  Thus, Mr. [NS] was not proposed as "key personnel," as the ITSM SME is not one of the "key personnel" positions contemplated by the RFP.  AR 3838 (§ H.1.b).

Nevertheless, IAP argues that the RFP *additionally* defines "key personnel" as: (1) "[p]ersonnel identified in the proposal as key personnel to be assigned for participation in the performance of the contract"; or (2) "[i]ndividuals who are designated as key personnel by agreement of the government and the contractor during negotiations."  Pl. MJAR at 10 (quoting AR 3839 (§ H.2.c)).  In that regard, IAP alleges that Vectrus identified six positions in its proposal as "key personnel" in addition to the four listed in the RFP, and that these six positions, including the ITSM SME role, fall under the first "defin[ition]" of "key personnel."  Pl. MJAR at 44.

IAP's reliance on § H.2 of the RFP is misplaced.  That RFP section is titled "Contractor Personnel *Administration*."  AR 3839 (§ H.2) (emphasis added).  Thus, this portion of the RFP, and its "defin[ition]" of key personnel, governs the terms of the contract only *after* the award (during contract administration) and does not apply to an offeror's proposal.  Indeed, Section H includes "Special Contract Requirements" and does

not contain either proposal instructions (Section L) or evaluation criteria (Section M). *See* FAR 15.204-2(h) (providing that Section H shall include "a clear statement of any special contract requirements that are not included in Section I, Contract clauses, or in other sections of the uniform contract format"); *John Blood*, B-298841, 2006 CPD ¶ 202, 2006 WL 3771802, at *2 (Comp. Gen. Dec. 21, 2006) (awardee's "actual compliance with [a] section H[ clause] is a matter of contract administration"); *Petchem, Inc.*, B-227109, 87-2 CPD ¶ 258, 1987 WL 102822, at *2 (Comp. Gen. Sept. 16, 1987) ("We find particularly persuasive in this regard the fact that the specific vessel characteristics—including draft and dimensions—were requested not for technical evaluation purposes, but under Section H, 'Special Contract Requirements,' which required that the work 'be performed' in accordance with the listed specifications . . . ."); *Sealift, Inc.*, B-298588, 2006 CPD ¶ 162, 2006 WL 3155722, at *2 (Comp. Gen. Oct. 13, 2006) (where "the solicitation does not require the offeror to provide the names of crew members or otherwise address how it will meet the need for a crew in its proposal," but rather only "requires the owner to provide the crew list no later than 96 hours prior to the time the ship is to be delivered," then "whether [the awardee] complies with [that requirement] is a matter of contract administration").

### 2. The Army Did Not Rely on the Availability of Mr. [NS] in Evaluating Vectrus's Proposal and Vectrus Did Not Misrepresent Mr. [NS]'s Availability

Even assuming, *arguendo*, that Vectrus had proposed Mr. [NS] for a key personnel position, contrary to this Court's interpretation of § H.2 of the RFP, IAP has not met its burden to demonstrate that Vectrus engaged in an improper "bait and switch."

To establish a "bait and switch" claim, a plaintiff must demonstrate:

> (1) the awardee represented in its proposal that it would rely on certain specified personnel in performing the services; (2) the agency relied on this representation in evaluating the proposal; (3) it was foreseeable that the individuals named in the proposal would not be available to perform the contract work; and (4) personnel other than those proposed are performing the services.

*Unified Architecture*, 46 Fed. Cl. at 64 (citing *Labat-Anderson, Inc. v. United States*, 42 Fed. Cl. 806, 855 (1999)); *see also Golden IT, LLC v. United States*, -- Fed. Cl. --, 2022 WL 334369, at *18 (2022) (explaining that while "an offeror may not knowingly misrepresent a material fact in a proposal for the purpose of winning a government contract," a plaintiff's "misrepresentation claim must be rejected if [the awardee] had a reasonable basis for proposing that it would commit [a particular individual] to serve as a member of key personnel in performing the [contract] at issue").

Elements 1 and 4 from the *Unified Architecture* framework are not at issue here — all parties agree that Vectrus proposed Mr. [NS] as its ITSM SME and that an individual other than Mr. [NS] will be serving in that role. The parties disagree, however, regarding (1) whether the Army's evaluation relied on Vectrus's representation that Mr. [NS] would serve as its ITSM SME, and (2) whether it was foreseeable that Mr. [NS] would leave Vectrus's employ prior to award. In other words, the parties contest whether Vectrus engaged in a knowing, material misrepresentation. *Unified Architecture*, 46 Fed. Cl. at 64–65 ("Termination of a contract award based on the proposal is appropriate where such a misrepresentation materially influences an agency's evaluation of an offeror's proposal."); *Golden IT*, 2022 WL 334369, at *18. Thus, the Court addresses the remaining elements of IAP's bait and switch claim.

*First*, the Army did not rely on Vectrus's representation that Mr. [NS] would serve as its ITSM SME in evaluating Vectrus's proposal. IAP dedicates a great deal of space in its briefs in an attempt to convince the Court that Mr. [NS] was "material" to Vectrus's approach and that the inclusion of Mr. [NS] in Vectrus's proposal "contributed" to the Army's assignment of two significant strengths and one strength to Vectrus. Pl. MJAR at 45–46; Pl. Resp. 26–28. For example, IAP asserts that Vectrus's proposal "touted his incumbent experience," and his inclusion was "[e]ssential" to Vectrus's proposal, and, as a direct consequence, "[t]he SSEB evaluated and assigned a significant strength to Vectrus for its 'experience and its organizational approach.'" Pl. MJAR at 43–45 (arguing that the SSEB's award of a significant strength to Vectrus on Subfactor 1 is directly correlated to "Vectrus' discussion of the experience of its Key Personnel—including Mr. [NS]—under the incumbent contract and commitment to provide 'continuity'").[28]

This argument "taxes the credulity of the credulous." *Maryland v. King*, 569 U.S. 435, 466 (2013) (Scalia, J., dissenting). First, while the role of the ITSM SME position is mentioned in several places throughout Vectrus's proposal, Mr. [NS] is mentioned *once* in the proposal, *see* AR 7968 (identifying "[NS]" as Vectrus's current ITSM SME), and there is no indication that Vectrus's entire management (Subfactor 1) approach hinged on the identity of its ITSM SME. Second, nothing in the record demonstrates that Mr. [NS] was a material factor in the Army's evaluation of Vectrus's proposal. Furthermore, there is *zero evidence* that the Army's assignment of the two significant strengths (and one strength) to Vectrus on Subfactor 1 had anything to do with Mr. [NS]. Indeed, the Army does not appear to have even mentioned Mr. [NS] or ITSM SME in any of its evaluation documents the Court reviewed.[29] *See, e.g.*, AR 9071–9103 (MS/TA Team

---

[28] IAP presents similar arguments for the second significant strength and one of the strengths assigned to Vectrus on Subfactor 1. Pl. MJAR at 44–46.

[29] Notably, the only instance the term "ITSM SME" (or derivatives thereof) is mentioned in the source selection documents is in reference to [Juliet]'s proposal — and not even in a final document — in an email attachment from the MS/TA team to the SSA answering her MS/TA

Initial Report); AR 9308–87 (SSEB Initial Evaluation); AR 9388–98 (SSAC Final Report); AR 9399–9413 (Source Selection Decision Document). Accordingly, the Court finds that Vectrus's inclusion of Mr. [NS] in its proposal was not "material" and his proposed role as ITSM SME did not influence the Army's evaluation.

*Second*, there is no evidence that Vectrus knew, or should have known, that Mr. [NS] planned to depart Vectrus at the time it submitted its proposal to the Army. Again, the parties do not dispute that Mr. [NS] was an employee of Vectrus on May 17, 2019, the day Vectrus submitted its proposal. *See* Am. Compl. ¶ 254; Def. MJAR at 47; Intv. Resp. at 25. Nor do the parties dispute that Mr. [NS] left Vectrus after proposal submission, but prior to award, around October 2020. Am. Compl. ¶ 254; Def. Resp. at 25; Pl. Resp. at 25; Intv. MJAR at 44. What the parties *do* dispute — and what IAP fails to, and cannot, prove — is whether it was foreseeable (to Vectrus) that Mr. [NS] would leave Vectrus prior to contract award.

There is no evidence whatsoever in the administrative record — or proffered by any party — suggesting that Vectrus had any indication *at the time it submitted its proposal* that Mr. [NS] intended to leave Vectrus for another employer and would be unavailable to perform the contract work. *See Unified Architecture*, 46 Fed. Cl. at 65; *Golden IT*, 2022 WL 334369, at *19 ("The fatal problem for [Plaintiff]'s claim, however, is that there is simply no evidence in the record — literally, nothing — demonstrating that [the awardee] had any knowledge prior to submitting its proposal, or at any point before [the employee's] departure from [the awardee], that he intended to leave [the awardee]."). IAP did not sustain its burden of proof on this claim.

Accordingly, the Court finds that (1) the Army did not rely on Vectrus's representation concerning Mr. [NS] in evaluating Vectrus's proposal, and (2) Vectrus had no reason to know that Mr. [NS] would leave Vectrus prior to contract award. IAP's "bait and switch" claim fails at a minimum for lack of evidence.

### 3. Vectrus Had No Duty to Notify the Army of Mr. [NS]'s Departure

IAP further alleges that Vectrus had a duty to notify the Army of the departure of Mr. [NS] and that Vectrus's failure to do so is grounds for disqualification. Pl. MJAR at 42–43; Pl. Resp. at 25–26. This Court recently rejected the existence of such a duty in *Golden IT*, 2022 WL 334369, at *20–22. In short, an offeror is *not* obligated to notify an agency of the departure of key personnel post-proposal submission, absent an affirmative requirement to do so in the solicitation. *Id.*

---

questions. *See* AR 9065 ("Offeror Juliet proposed one ITSM subject matter specialist, ITIL Intermediate certified, as a member of its training team under sub-factor 1.").

Specifically, in rejecting the GAO rule requiring offerors to notify agencies of changes in staffing, this Court explained:

> A proposal is submitted at a point in time and is evaluated over what is often a lengthy period. The Court agrees, of course, that an offeror must have a reasonable basis for all facts and representations made in its proposal — and may not knowingly or recklessly include false statements of material fact. A court's assessment of an offeror's knowledge of facts and representations, however, is made with respect to the point in time at which the offeror submitted its proposal. Software versions may change, planned approaches to contract performance might be altered or improved by the time of contract award, and employees may come and go — none of those are problems *per se*. And, where contemplated in a solicitation, the government typically has discretion to engage in discussions to verify proposal details, to extract more details and ultimately include them into an awarded contract, or to seek final proposal revisions ("FPRs") for the purpose of confirming key personnel. But, the Court will not conjure up a rule — and particularly not one untethered from a statute, regulation, or Federal Circuit decision — requiring offerors or quoters to routinely update the government when facts and circumstances change post-proposal or quote submission, during the course of the government's evaluation period.

*Golden IT*, 2022 WL 334369, at *21 (citations omitted).

Here, the Solicitation did not require offerors to submit résumés, let alone to *name* their key personnel. AR 3964 (§ L.8.2.B.3). Furthermore, the RFP did not require offerors to update the Army prior to contract award about proposed key personnel departures. Additionally, there is nothing in the record that demonstrates, by a preponderance of the evidence, that Vectrus had any knowledge at the time of proposal submission that Mr. [NS] would not be available for contract performance.

Accordingly, the Court finds that Vectrus had no duty to notify the Army of the departure of Mr. [NS], and Vectrus's failure to do so does not render Vectrus's proposal unawardable.[30]

---

[30] In light of the Court's conclusions that Vectrus did not materially misrepresent the availability of Mr. [NS] and that Vectrus had no freestanding obligation to inform the Army of Mr. [NS]'s

**D.  The Army's Cost Realism Evaluation Was Reasonable (Count VII)**

IAP contends that the Army's cost realism evaluation was "flawed."  Pl. MJAR at 37–41; Am. Compl. ¶¶ 261–280; Pl. Resp. at 24.  IAP's argument is two-pronged.  First, IAP challenges the method used by the cost team to evaluate the realism of certain direct labor rates.  Am. Compl. ¶¶ 265–268; Pl. MJAR at 40–41; Pl. Resp. at 24.  Second, IAP alleges that that the Army improperly evaluated Vectrus's proposed labor hours.  Am. Compl. ¶¶ 269–280; Pl. MJAR at 37–40; Pl. Resp. at 24.

An agency is required to perform a cost realism analysis in a cost-reimbursement procurement "to determine the probable cost of performance for each offeror."  FAR 15.404-1(d)(2).  The FAR defines "[c]ost realism analysis" as:

> the process of independently reviewing and evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

FAR 15.404-1(d)(1).

There are two main purposes of a cost realism analysis:  (1) "to prevent offerors from gaining an advantage over competitors by proposing an unrealistically low estimated cost"; and (2) "to determine whether offerors understand the contract requirements."  *VS2, LLC v. United States*, 155 Fed. Cl. 738, 759 (2021) (emphasis omitted) (first quoting Ralph C. Nash & John Cibinic, *Cost Realism Analysis in Negotiated Fixed Price Contracts: Confusion at the GAO or a New Limitation on Buy-Ins?*, 4 Nash & Cibinic Rep. ¶ 61 (1990); and then quoting Ralph C. Nash & John Cibinic, *Cost Realism Analysis in Cost Reimbursement Contracts: What are the Rules of the Game?*, 5 Nash & Cibinic Rep. ¶ 40 (1991)).  "Agencies tasked with performing such an analysis must make appropriate probable cost adjustments such that an offeror's proposed cost best reflects the estimated cost of performance."  *Synergy Sols., Inc. v. United States*, 133 Fed. Cl. 716, 749 (2017) (citing FAR 15.404–1(d)(2)(i)).  Put simply, a cost realism analysis "addresses whether a cost estimate is too low."  *First Enter. v. United States*, 61 Fed. Cl. 109, 123 (2004).

---

departure, the Court need not address IAP's argument that the Army engaged in "unequal discussions" in allowing Vectrus to name a substitute for Mr. [NS]'s position, Pl. MJAR at 46–48, as such "discussions," if they can even be called that, were not improper given the terms of the procurement as specified in the RFP.

The Federal Circuit has instructed that "agencies enjoy wide latitude in conducting the cost realism analysis." *Agile Def., Inc. v. United States*, 959 F.3d 1379, 1385–86 (Fed. Cir. 2020); *see also A-T Sols., Inc. v. United States*, 122 Fed. Cl. 170, 180 (2015) ("As cost realism determinations are within an agency's 'sound discretion and expertise,' the Court will not overturn a cost realism determination unless the plaintiff demonstrates the absence of a rational basis for the agency's decision." (quoting *CTA Inc. v. United States*, 44 Fed. Cl. 684, 693 (1999))). Although the FAR "provides examples of cost analysis techniques," it "does not mandate the use of any specific methodology." *Agile Def.*, 959 F.3d at 1386 (citing FAR 15.404-1(c)). Rather, the FAR provides that "[t]he [g]overnment may use various cost analysis techniques and procedures to ensure a fair and reasonable price, given the circumstances of the acquisition." FAR 15.404-1(c)(2). Thus, "[w]hile an agency's cost realism analysis need not have been performed with 'impeccable rigor' to be rational, the analysis must reflect that the agency considered the information available and did not make 'irrational assumptions or critical miscalculations.'" *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007) (quoting *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000)).

For the reasons explained below, this Court rejects IAP's claims concerning the Army's cost realism evaluation.

### 1. The Army's Evaluation of Direct Labor Rates (Count VII.A)

As discussed *supra*,[31] the Army's cost evaluation team performed a cost realism analysis of offerors' labor rates in accordance with FAR 15.404-1. AR 9187–88 (Initial Price/Cost Proposal Analysis). The cost team utilized two different methods to evaluate offerors' labor rates:

> The direct labor rate analysis produced 1,777 lines of labor categories among the proposals[,] which translated into 520 unique labor categories. In order to evaluate the rates, the unique labor categories were grouped into 368 categories based on the PWS requirements. The [g]overnment used two methods of labor rate evaluation. First, those rates that were able to be, were compared on a competitive basis and a statistical methodology was used to determine if a rate was realistic or not. [Second,] [i]f less than three rates were proposed for the same labor category[,] then the Bureau of Labor Statistics (BLS) and the Economic Research Institute (ERI) were used as outside pricing assistance to determine the realism of the remaining rates. The [g]overnment identified the rates at the 10th, 25th, 50th, 75th, and 90th percentiles in

---

[31] *See* Sections I.A.3 and I.B.1.b.

each database.  The [g]overnment selected Washington, D.C. as the rate location as Middle East locations are not available. The average of the BLS 25th percentile rate and the ERI 25th percentile rate was used as a basis to determine the realism of the proposed direct labor rates.  Therefore, if a proposed rate fell below that benchmark, it was determined to be unrealistic.

AR 9187–88.

IAP challenges the first method, alleging that it is "flawed" because "the Army relied on [a] 'competitive' approach . . . to determine realism *even if all three rates were from the same offeror*."  Pl. MJAR at 40; *see also* Am. Compl. ¶ 266; Pl. Resp. at 24.  Instead, IAP argues, the Army should have analyzed offerors' labor rates using *only* the second method.  Am. Compl. ¶ 268; Pl. MJAR at 41.

The Court agrees with IAP that the first method is irrational only insofar as the Army applied it to "proposed rates submitted by the same offeror for the same labor category."  Pl. MJAR at 41 (quoting AR 11389 (Schwartz Decl. ¶ 28)).[32]  The Court does not understand how comparing an offeror's labor rates to its own labor rates realistic (even if multiple locations are used).  The question is the impact of that flaw.  IAP asserts that "at a minimum, 13 additional Vectrus labor rates would have been found unrealistic" had the Army employed the second method of evaluating the realism of labor rates.  *Id.* As a result, according to IAP, an additional $24 million should have been added to Vectrus's total evaluated price.  *Id.*

The Court rejects IAP's argument for lack of proof.  IAP cites to its expert's conclusion in a declaration, including his "[s]upporting [c]alculations," but otherwise provides no explanation for the $24 million sum.  Pl. MJAR at 41 (first citing AR 11390 (Schwartz Decl. ¶¶ 30–32); and then citing AR 11574–11917).  The expert's declaration, however, does not explain the math.  Moreover, the referenced "supporting calculations" span approximately 340 pages, and the Court cannot discern how IAP's expert identified the aforementioned thirteen labor categories (with no comparable rates from other offerors) or how he arrived at a projected $24 million increase to Vectrus's total evaluated price.[33]  The Court is not obligated to comb 340 pages of data to attempt to reconstruct or

---

[32] The administrative record filed with the Court includes the GAO record.  The latter contains a declaration from IAP's expert, Mr. Marc P. Schwartz, a senior manager with Chess Consulting LLC.  AR 11383–91.

[33] The Court agrees wholeheartedly with Vectrus: "IAP's 'expert report' does not reveal the formula used support these calculations, and thus this claim cannot [be] verified."  *See* Intv. Resp. at 30 n.96.

prove IAP's expert's argument.  IAP has the burden of proof, and it is not carried on this issue.[34]

In any event, IAP is not prejudiced by the Army's analysis.  As discussed *supra* Section V.A, this Court has found that the Army reasonably determined that IAP's proposal was unawardable based on a reasonably assigned Unacceptable rating on the MS/TA factor.  Thus, to the extent the Army erred in its evaluation of the offerors' direct labor rates, IAP was not prejudiced by the error because its proposal was ineligible for award.  *See Unified Architecture*, 46 Fed. Cl. at 64 (finding that while the agency's cost realism analysis "might have been arbitrary and capricious, plaintiff . . . has not demonstrated that [the agency]'s error was significant and prejudicial," where the error will not change the source selection result); *Worldwide Language Res., LLC. v. United States*, 127 Fed. Cl. 125, 135 (2016) ("[E]ven if [plaintiff] had shown that the exclusion of [certain] costs from the total evaluated price was in error, plaintiff has failed to show they were prejudiced by that exclusion.").

### 2.  The Army Rationally Analyzed the Offerors' Labor Hours (Count VII.B)

Additionally, IAP alleges that that the Army failed to conduct a rational cost realism analysis of the offerors' proposed labor hours.[35]  Am. Compl. ¶¶ 269–280; Pl. MJAR at 37–40; Pl. Resp. at 24.  Specifically, IAP contends that the Army "never reconcile[d] [a] fundamental disagreement among the cost and technical evaluation teams" as to whether the labor hours in Vectrus's cost proposal was "underestimated by more than 6 million hours."  Am. Compl. ¶¶ 271–272 (emphasis omitted); *see also* Pl. MJAR at 39; Pl. Resp. at 24.  Upon careful review of the record, the Court finds that this assertion is patently false.[36]

---

[34] Given the Court's conclusion, the Court need not reach the government's argument that Mr. Schwartz's declaration should be disregarded as an "inappropriate supplementation of the administrative record."  Def. MJAR at 44 n.4.

[35] In its MJAR, IAP raised three other arguments under this count.  Pl. MJAR at 37–39.  The government countered each of these claims in its response brief.  Def. Resp. at 20–22.  IAP, however, failed to address these arguments in its response brief.  Accordingly, the Court finds that IAP has abandoned those three arguments and need not address them.  *See Golden IT*, 2022 WL 334369, at *12 ("This Court will not permit a party to raise a phalanx of thin arguments in a dispositive motion — thereby forcing the opposing party to spend time and briefing space to engage with all of them — only to abandon them in the face of the counterarguments, and yet insist that the Court adjudicate the entire initial salvo. Such a buckshot-like approach to advocacy undermines both judicial economy and basic notions of fairness."); *see also* discussion *infra* Section V.F.

[36] The Court is not surprised that this argument is whittled down to a single paragraph in IAP's response brief.  Pl. Resp. at 24.

As summarized *supra*,[37] as part of the MS/TA team's analysis of offerors' proposed staffing and labor hours, the MS/TA team compared offerors' staffing matrices and sanitized cost workbooks to ensure that the labor hours proposed therein were consistent and realistic.  AR 9197–9220; *see also* AR 9322 (SSEB Initial Report).  When the MS/TA team initially reviewed Vectrus's cost proposal, the team recognized that the labor hours listed therein did not match up with either the proposed cost or the labor hours the team calculated based on Vectrus's staffing matrix.  AR 9208.  The MS/TA team communicated this finding to the cost team, which concurred.  AR 9184 (Initial Price/Cost Proposal Analysis).  Subsequently, upon review of the initial data, the SSA asked the SSEB to investigate the apparent discrepancy.  AR 8901 (SSA Email Exchange with SSEB – SSA Evaluation Questions) ("How does [Vectrus] have significantly [fewer] overall hours ([ * * * ]) than all other offers and half that of the [Independent Government Estimate], but have the third most [contract manpower equivalents] ([ * * * ])?  How are [Vectrus]'s hours reasonable for the work scope if they are less than [ * * * ] that of the [Independent Government Estimate] and other offerors?"); *see also* AR 9066–67.  Ultimately, both the MS/TA and cost evaluation teams determined that the discrepancy was the result of a formula error in Vectrus's Excel spreadsheet (the cost workbook): the formula in the column reflecting the "Total Productive Labor Hours" in each spreadsheet did not account in its calculations for the number of FTEs proposed for that labor category, and only accounted for a single FTE per labor category.[38]  AR 9053, 9066–67 (SSA Email Exchange with SSEB – SSEB Response); AR 9193; AR 8158 (Vectrus Proposal, Volume 4 – Cost Workbook).

   Upon adjusting the spreadsheets to account for the formula discrepancy, the teams were able to determine the correct labor hours in Vectrus's cost proposal.  AR 9053; AR 9193.  The MS/TA team also confirmed that Vectrus's proposed labor hours were "adequate to accomplish the work scope."  AR 9067; AR 9068.

   The Court has examined the administrative record, including Vectrus's sanitized and unsanitized cost workbooks.  The Court finds that there is no evidence whatsoever supporting IAP's claim that the Army's cost realism evaluation of Vectrus's labor hours was irrational or otherwise flawed.  *See A-T Sols.*, 122 Fed. Cl. at 180 (declining to overturn an agency's cost realism determination because the agency "had a rational basis for concluding that [the awardee]'s staffing proposal met the requirements of the solicitation and that [the awardee]'s cost proposal was realistic").

---

[37] *See* Section I.B.1.b.

[38] The teams also realized that they failed to account for Vectrus's subcontractors' cost data, which was contained in separate files.  AR 9193.

**E.  The Army Did Not Disparately Evaluate IAP's Proposal (Counts II.A, V.A, and IX)**

IAP's next challenge is that the Army unlawfully engaged in unequal treatment in its evaluation of IAP's proposal, in violation of FAR 1.102(b) and 1.602-2.[39]  Am. Compl. ¶¶ 178–183, 234–235, 283–288; Pl. MJAR at 25, 28, 30–37.  The Court, however, does not find any of IAP's arguments concerning disparate treatment persuasive.

To succeed on a disparate treatment claim, a plaintiff must demonstrate either: (1) "the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals"; or (2) "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (quoting *Hamilton Sundstrand Power Sys. v. United States*, 75 Fed. Cl. 512, 516 (2007)).  In this case, IAP challenges the allegedly disparate technical ratings; thus, only the first *Office Design Group* standard applies.

*First*, IAP argues that the Army, in its evaluation of other offerors' OSP approach, "did not hold the other offerors to an equal standard [to that of IAP], in contravention of FAR 1.102 and 1.602-2."  Pl. MJAR at 28.  For example, IAP asserts that the Army faulted IAP for "not identify[ing] the regions where [the centralized] teams would provide support," but failed to "criticize the OSP approach of [other] offerors" for not "mention[ing] specific locations" in their narratives.  *Id.* at 27–28.  The Court rejects this assertion, finding it plainly wrong.  IAP was not penalized by the Army for merely failing to "identify the regions where [the centralized] teams would provide support" in its narrative, *see* AR 9348; rather, IAP was faulted for failing to propose sufficient OSP support in *either* its narrative or its staffing matrix.  While other offerors may have not provided significant detail in their narratives about their proposed approaches to OSP support, they *did* propose OSP services at the required locations in Iraq in their staffing matrix, unlike IAP.  Thus, there was no "[un]equal standard" concerning the requisite detail in offerors' OSP support narrative, and IAP's error was not "substantively indistinguishable" from those of other offerors.  *Off. Design Grp.*, 951 F.3d at 1372.

*Second*, IAP suggests that the Army's assignment of a deficiency to IAP for inadequate OSP support "amounts to unequal treatment" because other offerors had "substantially identical" OSP staffing shortfalls and they were merely assigned "a weakness, an uncertainty, or nothing."  Pl. MJAR at 30.  IAP asserts that "had the Army

---

[39]  FAR 1.102(b)(3) instructs agencies to "[c]onduct business with integrity, fairness, and openness," while FAR 1.602-2 requires that "[c]ontracting officers shall . . . [e]nsure that contractors receive impartial, fair, and equitable treatment[.]"  *See also Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 87–88, 88 n.15 (2020) (discussing FAR 1.102 and 1.602-2).

treated IAP equally as the FAR required," IAP would have received, at most, a "minor weakness." *Id.* at 32. Like the preceding argument, the Court finds this claim simply incorrect as a factual matter. In contrast to other offerors, IAP was not assigned a deficiency for proposing merely "insufficient OSP hours." *Id.* Rather, the Army faulted IAP for failing to propose sufficient OSP support *for an entire country.* None of the other offerors' proposals completely eliminated support in an entire labor category for an entire country. Therefore, the shortfalls are not "substantively indistinguishable" and, thus, IAP was not disparately evaluated. *Off. Design Grp.*, 951 F.3d at 1372.

*Third*, IAP contends that [Alpha] received "a mere uncertainty" for omitting from its staffing matrix the required Site Lead Technician at the [ * * * ], when it should have received a deficiency because [Alpha]'s "flaw" is "substantially similar to the Army's purported basis" for assigning IAP a deficiency. Pl. MJAR at 33–35. [Alpha], however, *did* propose in its narrative that it would provide a Site Lead Technician at the [ * * * ]. *See* AR 5712 ([Alpha] Proposal, Volume 2 – Mission Support/Technical Approach | Sub-Factor 1). Thus, [Alpha]'s error amounted to a mere discrepancy between its narrative and staffing matrix, and not a complete failure to propose sufficient support. IAP's proposal, in contrast, was consistent in its pervasive omission — IAP's proposal contained *no evidence of OSP support* in Iraq in *either* its narrative *or* its staffing matrix. Furthermore, IAP's error was *material* — it eliminated an entire labor category from a country without providing sufficient detail as to how the necessary support would be provided. As such, IAP's error is *not* "substantively indistinguishable" from that of [Alpha]. *Off. Design Grp.*, 951 F.3d at 1372.

*Fourth*, IAP alleges that [Alpha] and [Juliet] had inconsistencies between their narratives and staffing matrices concerning proposed OSP support, and had the Army treated their proposals the same as IAP's, they would have been assigned deficiencies. Pl. MJAR at 35–36. Such *discrepancies*, however, did not represent a complete failure to propose sufficient OSP support in *both* their narratives and staffing matrices. For example, in [Juliet]'s technical narrative, [Juliet] proposed "at least two OSP Technicians on shift at all times." AR 7019 ([Juliet] Proposal, Volume 2 – Mission Support/Technical Approach | Sub-Factor 2). However, in [Juliet]'s staffing matrix, [Juliet] proposed to have two OSP technicians in some locations but a single OSP technician in other locations. *See, e.g.*, AR 7035 (listing two OSP technicians at [ * * * ], but only one OSP technician at [ * * * ], and indicating that the OSP technician would be "[s]upported by Network Admin [sic] as needed for 2 man safety"). Similarly, [Alpha] represented in its narrative that its "OSP teams always have at least two technicians on shift." AR 5773 ([Alpha] Proposal, Volume 2 – Mission Support/Technical Approach | Sub-Factor 2). Like [Juliet], [Alpha]'s staffing matrix reflected two OSP technicians in some TE2-required locations, but only one in others. *See, e.g.*, AR 5809 (listing two OSP technicians at [ * * * ], but only one OSP technician at [ * * * ]). Thus, IAP's error is substantively distinguishable from that of [Alpha] and [Juliet], as there was a *discrepancy* between [Alpha]'s and [Juliet]'s respective narratives and staffing matrices as to the *level* of support in some locations, but not a *clear*

*lack* of support as the Army evaluators found for IAP.  *See Off. Design Grp.*, 951 F.3d at 1372.

*Fifth*, IAP asserts that the Army "violate[d] the FAR's equal treatment mandate" by allowing Vectrus to use its "Statement of Compliance" to "remedy its failure" to meet the ITIL Requirement, but assigned IAP a deficiency "for purportedly failing to offer sufficient OSP support in Iraq." Pl. MJAR at 25.  This argument fails for two reasons. First, as discussed *supra* Section V.B, Vectrus did not take exception to the ITIL Requirement, and the Army reasonably found that Vectrus complied with the requirement.  Second, to succeed on a disparate treatment claim, a plaintiff must demonstrate that the agency evaluated *similar* deficiencies in two proposals unequally. *See Off. Design Grp.*, 951 F.3d at 1372.  Here, however, IAP's comparison of the ITIL Requirement to the OSP support requirement is like the proverbial comparison of apples to oranges.  IAP seeks to compare two vastly different RFP requirements without explaining why such a comparison has any merit.  *See Fluor Intercontinental, Inc. v. United States*, 147 Fed. Cl. 309, 330 (2020) (finding no disparate treatment where "the offerors' 'systemic issues' were of two inherently different breeds").  Thus, *even if* the Army improperly allowed Vectrus to rely on its "Statement of Compliance" to meet the ITIL Requirement *and* the ITIL Requirement was a "material" requirement — which it is not — thus rendering Vectrus's proposal "noncompliant," such a "deficiency" is not "'substantively indistinguishable' or nearly identical" to IAP's complete failure to provide adequate OSP staffing coverage in Iraq.  *Off. Design Grp.*, 951 F.3d at 1372; *see also Tech. Innovation All. LLC v. United States*, 149 Fed. Cl. 105, 132 (2020) ("Indeed, having the Court pass judgment regarding the relative merits of proposals that are not substantively indistinguishable 'would give a court free reign to second-guess the agency's discretionary determinations underlying its technical ratings' and '[t]his is not the court's role.'" (alteration in original) (quoting *Office Design Grp.*, 951 F.3d at 1373)).  Accordingly, the Court finds that IAP's final disparate treatment argument lacks merit.

IAP fails to demonstrate that the Army disparately evaluated its proposal, and the Court does not find that the Army evaluators erred in their discretionary assignment of a deficiency to IAP's proposal.

### F.  IAP Abandoned Counts II.B, II.C, IV, and V.B

The Court finds that IAP has abandoned the following claims from its amended complaint:  (1) Count II.B (challenging the failure to conduct clarifications), Am. Compl. ¶¶ 185–192; (2) Count II.C (challenging the significant weakness and weakness assigned to IAP on Subfactor 2), Am. Compl. ¶¶ 193–206; (3) Count IV (challenging the weakness on assigned to IAP on Subfactor 1), Am. Compl. ¶¶ 216–227; and (4) Count V.B (challenging a strength assigned to Vectrus on Subfactor 1 and that IAP should have been assigned a comparable strength), Am. Compl. ¶¶ 236–240.  As the government and

49

Vectrus correctly note, IAP fails to address these claims in its MJAR.  Def. Resp. at 1–2; Intv. Resp. at 1.

The Court agrees with the government and Vectrus that IAP has abandoned these counts and, thus, need not consider the claims alleged thereunder.[40]  *See Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 357–58 (2007) (finding that "plaintiff has waived [four] counts of the complaint" when it failed to address them in its MJAR); *Sarro & Assocs., Inc. v. United States*, 152 Fed. Cl. 44, 58 (2021) ("Indeed, in responding to the government's motion to dismiss, [Plaintiff] appears to have all but abandoned this particular claim contained in the amended complaint.  A party's failure to raise an argument in an opening or responsive brief constitutes waiver." (citations omitted)); *Chromalloy San Diego Corp. v. United States*, 145 Fed. Cl. 708, 740 (2019) ("[W]hen a plaintiff asserts a claim in its complaint but then fails to pursue it in a dispositive motion, the court can deem that claim abandoned or waived."); *Chenega Healthcare Servs., LLC v. United States*, 141 Fed. Cl. 254, 259 n.4 (2019) ("The court agrees with the government that [Plaintiff] has waived reliance on any counts of the complaint not addressed by [P]laintiff's dispositive motion."); *Singer Co. v. United States*, 568 F.2d 695, 718 (Ct. Cl. 1977) ("This claim was called out in plaintiff's petition but the briefs which plaintiff submitted offer no discussion of this claim. We assume, therefore, that the claim has been abandoned.").

### G. The Administrative Record Does Not Support the Army's Decision Declining Both to Establish a Competitive Range and to Conduct Discussions (Count I)

IAP contends that the government's "failure to engage in discussions" in this procurement "was arbitrary, capricious, and an abuse of discretion," Am. Compl. ¶ 131, "or otherwise not in accordance with law," *id.* ¶ 157.  In particular, IAP argues that the Army did not comply with DFARS 215.306.  *Id.* ¶¶ 135–138; Pl. MJAR at 19–23; Pl. Resp. at 2–4.  The Court agrees with IAP.

#### 1. The Plain Language of DFARS 215.306 Creates a Regulatory Presumption in Favor of Conducting Discussions

Although the Court has addressed the relevant DFARS provision at length in *Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 108–14 (2021), the Court begins once again with the regulation's plain language: the DFARS provides that "[f]or acquisitions

---

[40] The Court notes that IAP obliquely references Count II.C in its MJAR in two footnotes, Pl. MJAR at 5 n.4, 29 n.11, and Count V.B is briefly mentioned in its MJAR twice, Pl. MJAR at 16 (statement of facts), 20–21 (discussions argument), and in one sentence in its response brief, Pl. Resp. at 5. These tangential inferences do not develop or support the arguments, however, and do not save these counts from abandonment.

with an estimated value of $100 million or more, contracting officers *should* conduct discussions." DFARS 215.306(c)(1) (emphasis added). The key word in that provision, manifestly, is "should" — a term synonymous with neither "may" nor "shall." Indeed, the FAR separately defines all three terms: "***May*** denotes the permissive"; "***Shall*** denotes the imperative"; while "***Should*** means an expected course of action or policy that is to be followed unless inappropriate for a particular circumstance." FAR 2.101 (emphasis added). The fact that DFARS 215.306 employs the term "should" does not mean that following the regulation somehow is optional for the Department of Defense or, by extension, the Army. *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1311 (Fed. Cir. 2021) ("Naturally, an agency has no discretion to disregard binding regulations." (citing 5 U.S.C. § 706(2))). The question, then, is not whether the Army must follow DFARS 215.306 — that premise is not in dispute — but rather how much discretion the Army possesses *not* to engage in discussions given that the DFARS provision governs this procurement. To answer that question, we must back up a bit and establish "some [additional] first principles." *Washington Metro. Area Transit Auth. v. United States*, 54 Fed. Cl. 20, 27 (2002).

What the FAR makes clear is that, depending upon the particular provision at issue, there exists a continuum of agency discretion, ranging from its apex (indicated by the word "may") to its nadir (indicated by the word "shall")[41] — with "should" falling somewhere in the middle. *See* FAR 2.101. Each of those terms — "may," "should," and "shall" — have different meanings. *Id.*; *cf. United States v. Maria*, 186 F.3d 65, 71 (2d Cir. 1999) (explaining that "where the Sentencing Commission chose the word 'should' instead of 'shall' or 'must,' the Commission meant what it said and said what it meant"). And just as there is an obvious distinction between "should" and "shall" — because "[a]s a general matter, the use of different words within the same statutory context strongly suggests that different meanings were intended" — so, too, "[t]he difference between 'may' and 'should' is significant." *Maria*, 186 F.3d at 71.[42]

Applying those interpretative principles to DFARS 215.306(c)(1), the Court continues to stand behind its conclusion in *Oak Grove* that "the DFARS provision's plain language . . . create[s] a presumption in favor of an agency's conducting discussions." 155 Fed. Cl. at 108 ("the DFARS provision's plain language suggests that an agency must justify not engaging in discussions where the provision applies" (emphasis omitted)); *see*

---

[41] FAR 15.306, for example, employs the word "shall" twelve times, and the word "may" sixteen times.

[42] *See also Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171–72 (2016) (explaining that "[u]nlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement" and that "[w]hen a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty"); *Alamo Travel Grp., LP v. United States*, 108 Fed. Cl. 224, 233 (2012) ("The definitions in FAR section 2.101, which have a uniform meaning throughout the FAR unless otherwise specified, draw a sharp line in usage between 'shall' and 'should.'").

*also Maria*, 186 F.3d at 73 (explaining that the term "should" "creates . . . a 'strong *presumption*'" (emphasis added) (quoting *United States v. Walker*, 98 F.3d 944, 945 (7th Cir. 1996)). The Court's interpretation of DFARS 215.306 in *Oak Grove* was not formulated *ex nihilo*, but rather is premised on binding Federal Circuit precedent that adopted the government's own operational interpretation of that provision:

> The Federal Circuit's decision in *Dell Federal Systems, L.P. v. United States* removes any doubt that DFARS 215.306 generally requires an Agency to engage in discussions. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982 (Fed. Cir. 2018).
>
> In *Dell Federal Systems*, unsuccessful offerors filed GAO protests, arguing, amongst other things, "that the Army should have engaged in discussions with offerors . . . as required by [DFARS] 215.306(c)[.]"   906 F.3d at 987–88 (footnoted omitted).  As part of the agency's corrective action to resolve the protests, the agency decided it would reopen the procurement to conduct discussions, request new final proposals, and then issue a new award decision.   The cognizant contracting officer explained "that because the procurement was valued in excess of $100 million, the Army *was likely required to* [but did not] conduct discussions with offerors pursuant to DFARS 215.306(c)(1)."  *Id.* at 988.  Two of the initial awardees filed suit in this Court, seeking to enjoin the corrective action. *Id.* at 989.  On appeal, the Federal Circuit upheld the agency's corrective action, holding that, pursuant to DFARS 215.306, "discussions normally are to take place in these types of acquisitions."  *Id.* at 995–96.  Thus, the Federal Circuit "determine[d] that the corrective action of conducting discussions is rationally related to the *undisputed procurement defect of originally failing to conduct pre-award discussions . . . .*" *Id.* (emphasis added).

*Oak Grove*, 155 Fed. Cl. at 108–09 (alterations in original) (first emphasis added).

In *Dell Federal Systems*, "the government plainly confessed the procurement error before the Federal Circuit, arguing that '[u]nless the Army conducts the discussions required by DFARS 215.306 under the facts of this case, the awards will be the result of a flawed procurement process.'"  *Oak Grove*, 155 Fed. Cl. at 109 (alteration in original) (quoting Reply Brief of Defendant-Appellant, *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982 (Fed. Cir. 2018) (Nos. 17-2516, 17-2535, 17-2554), 2018 WL 790985, at *13); *see also* Reply Brief of Defendant-Appellant, *Dell Fed. Sys.*, 2018 WL 790985, at *19 ("The *regulatory*

*expectation* in this procurement was that the Army would conduct discussions and the record shows that the agency had no reason not to do so." (emphasis added)).

Although *Dell Federal Systems* involved corrective action, the government in that case adopted a position regarding the operational definition of the DFARS provision at issue in order to justify its corrective action. The government cannot — and does not attempt to — distinguish *Dell Federal Systems* merely on the grounds that it involved corrective action. Again, in that case, the government decided that, given the administrative record, the agency had no choice but to conduct discussions in light of the DFARS provision, the presence of which was the critical factor the Army used to justify its rescinding the contract awards. *Dell Fed. Sys.*, 906 F.3d at 988 (noting Army's conclusion that it "was likely *required* to conduct discussions with offerors pursuant to DFARS 215.306(c)(1)" (emphasis added)). The regulation cannot mean one thing in that case and a different thing here. Nor can the government claim more discretion here (*i.e.*, to decline to conduct discussions) than the government had in deciding to reopen the procurement to conduct discussions in *Dell Federal Systems* (*i.e.*, where the Army concluded that it was all but required to do so). In sum, the Court will not adopt a rule that permits the government, *on an equally inadequate record*, either to exercise discretion to refuse to conduct discussions in the first place **or** to exercise discretion to rescind contract awards and open discussions for the purposes of complying with DFARS 215.306 — all at the government's sole option. That would be tantamount to giving the government virtually plenary, "may"-level discretion.

Accordingly, in this case, the Court asks the precise question the government itself posed in *Dell Federal Systems*: given that "[t]he *regulatory expectation* in this procurement was that the Army would conduct discussions," does the administrative record adequately explain a "reason not to do so"? Reply Brief of Defendant-Appellant, *Dell Fed. Sys.*, 2018 WL 790985, at *19 (emphasis added). The Court answers that question in the strong negative. The Army's decision to award without discussions is fatally undermined by the administrative record evidence, defies logic, and ignores DFARS 215.306.

### 2. The Administrative Record Does Not Justify the Army's Decision to Skip the Discussions Process

The Court confines itself, as it must, to the Army's stated reason — in the contemporaneous administrative record — for not conducting discussions. To say that the record addressing the subject is thin would be an understatement.[43] In that regard,

---

[43] The Court rejects Vectrus's assertion that the SSA issued a "five[-]page rationale for awarding to Vectrus *without discussions*." Intv. Resp. at 9. Contrary to Vectrus's overly generous characterization, the SSA did not "spen[d] pages documenting its reasoning for why discussions were *not* required." *Id.* at 10. The Court would agree that the SSDD, in general, is lengthy and

the SSAC's final report assessed that IAP's "proposal is unawardable" due to its Subfactor 2 rating — and, thus, that "[i]t is unlikely this area can be rectified with discussions." AR 9392. There is nothing more in the SSAC final report. The SSA in the SSDD similarly concluded that "[a]s a result of the [SSEB] review and in accordance with the basis for award, it is my determination there is one offeror that offers the best value to the government *and discussions are not required*." AR 9404 (emphasis added). Although the SSA indicated that her "decision [was] based on the following information," AR 9404, the subsequent discussion in fact consists only of the justification for the SSA's best value decision, with the exception of a short, discrete section focused on the decision to "Award Without Discussions," AR 9409 (§ 13). But that section contains only a summary of the offerors' evaluations and this assertion:

> Based on an integrated assessment of the proposal evaluations and the drafted evaluation notices, I have determined that *discussions would not result in any meaningful benefit to the Government, or any changes to the apparent outcome of the source selection decision*. Thus, in accordance with the terms and conditions of the solicitation, a contract will be awarded without discussions and a competitive range will not be established.

AR 9409 (§ 13) (emphasis added).

That threadbare, conclusory assertion is insufficient pursuant to DFARS 215.306.

*First*, neither the SSAC nor the SSA provided *any* facts, explanation, or analysis substantiating their question-begging conclusions, respectively, that IAP's initial ratings could not be "rectified with discussions," AR 9392, and that discussions would not change "the apparent outcome" of the procurement, AR 9409. In the absence of facts substantiated in the administrative record — and reasoned agency judgment based on such facts — these conclusions are mere *ipse dixit* and insufficient even under the deferential APA review standard. *Honeywell Int'l Inc. v. Arkema Inc.*, 939 F.3d 1345, 1348 (Fed. Cir. 2019) (applying 5 U.S.C. § 706(2)(A), and explaining that an agency "abuses its discretion if [its] decision" is based on a "record that contains no evidence on which the [agency] could rationally base its decision"); *see also In re Vivint, Inc.*, 14 F.4th 1342, 1351 (Fed. Cir. 2021) ("A decision is arbitrary and capricious when the agency fails to articulate a 'rational connection between the *facts* found and the choice made.'" (emphasis added) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))); *cf. Brand v. Miller*, 487 F.3d 862, 868–69 (Fed. Cir. 2007) (discussing "section

---

thorough, but the Court quotes the entirety of the SSDD addressing the discussions determination, *infra* Section I.B.2, and it is scarcely more than a handful of sentences; it is exceedingly brief, conclusory, and, ultimately, inadequate given DFARS 215.306.

706 of the APA" and noting that the Supreme Court has held that "agency expertise cannot substitute for record evidence" (citing *Baltimore & Ohio R.R. Co. v. Aberdeen & Rockfish R.R. Co.*, 393 U.S. 87, 91–92 (1968))). Under the APA, "[c]onclusory statements such as those here provided do not fulfill the [Army]'s obligation." *In re Sang Su Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002).

To make matters worse, Vectrus does not attempt to refute IAP's contention that "the SSAC's rationale for foregoing discussions is 'objectively false.'" Intv. Resp. at 13 (quoting Pl. MJAR at 19). Rather than providing any substantive justification for the SSAC's conclusion, Vectrus responds that because "the SSA did not carry forward the SSAC's rationale into the SSDD, IAP's challenge to the SSAC's rationale for foregoing discussions is legally immaterial." *Id.* This concession creates a gaping hole in the chest of the administrative record: if the SSAC's conclusion that IAP's proposal cannot "be rectified with discussions," AR 9392, is "objectively false," that must mean the proposal *could* be corrected. And if IAP's deficiencies could be remedied via a final proposal revision following discussions, how did the SSA conclude that discussions would not change the outcome of the procurement? That critical question is not answered in the government's or Vectrus's briefs, let alone in the administrative record itself.

*Second*, although the SSA asserted her decision was based, in part, on the draft ENs, the SSA did not even attempt to explain how those documents led her to conclude that offerors — including IAP — would not have been able to meaningfully improve their respective proposals. If anything, the mere existence of the draft ENs tends to demonstrate the opposite. In that regard, the cost team's report strongly suggested a need for discussions: "The cost realism analysis found that each offeror proposed multiple unrealistic direct labor rates. Findings and subsequent Evaluation Notices (EN) for each offeror are found at the end of this report, beginning on page 30." AR 9168 (Initial Price/Cost Proposal Analysis); *see also* AR 9176 ("An EN has been created for each offeror to clearly identify the overtime costs, hours, and multipliers."); AR 9188 ("[A]n EN has been created for each offeror asking for additional support for the unrealistic rates."); AR 9195 ("If discussions are held, the ENs may be used as topics for discussion with the offerors regarding their cost proposals. Once revised data has been received by offerors selected for the competitive range, if applicable, it will be re-analyzed."); AR 9221–44 (Cost Team Updated Draft ENs). Indeed, the ENs focused on cost apparently were updated, inexplicably, as late as December 22, 2020, just days before the Army formally notified Vectrus of its award. AR 9221; ECF No. 26 at 11 (indicating that Tab 46.c of the administrative record contains "Updated Draft ENs (December 22, 2020)"). Moreover, the MS/TA evaluation panel developed draft ENs specifically addressing the weaknesses, deficiencies, and risks that culminated in the Army's finding that IAP's proposal was not awardable. AR 9112–21. Nowhere does the administrative record

55

explain *why* the Army believed that IAP could not address those issues in response to the ENs or in a final proposal revision as part of the discussions process.[44]

*Third*, the entire point of discussions is to permit offerors "[a]t a minimum" to address "deficiencies" and "significant weaknesses" (amongst other information not relevant here).  FAR 15.306(d)(3); *see also Aviation Ground Equip. Corp.*, B-417711.2, 2021 CPD ¶ 183, 2021 WL 2109102, at *8 (Comp. Gen. May 3, 2021) ("The FAR makes clear one of the purposes of discussions is to address deficiencies and significant weaknesses in proposals." (citing FAR 15.306(d)(3)).  The FAR further "encourage[s]" the contracting officer "to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award."  FAR 15.306(d)(3).  Thus, the FAR expressly distinguishes between, on the one hand, "deficiencies" and "significant weaknesses" — both of which "the contracting officer *must . . .* discuss" with offerors — and, on the other hand, "other aspects" of a proposal that *may* potentially impact the chance for award.  *Id.* (emphasis added).

The point is that the FAR's operating premise is that providing offerors with an opportunity to address "deficiencies" and "significant weaknesses" via discussions, by definition, may "enhance materially the proposal's potential for award."  *Id.*[45]  The SSA turned this premise on its head.  Rather than engaging in discussions to see whether IAP might improve its "potential for award" via the submission of a FPR, the SSA merely assumed IAP could not do so, and then used that assumption to justify not engaging in

---

[44] The government asserts that "the evaluation teams' understandings of the proposal evolved and so, at the time the final evaluation reports and the SSDD were finalized, the benefit that the draft evaluations notices might have provided had been diminished."  Def. MJAR at 35.  The government cites no support in the administrative record for that assertion and, indeed, the Court concludes that the only such support is the SSA's *ipse dixit*, which this Court rejects.  In that regard, the government asserts that "the SSA considered the draft evaluation notices in determining that discussions were unnecessary," *id.*, but, again, neither the evaluation teams nor the SSA nor any other document in the administrative record provides any reasoned explanation for the conclusion that the evaluation notices would have proven ineffective in discussions.

[45] *See also CACI Field Servs., Inc. v. United States*, 13 Cl. Ct. 718, 731 (1987) (explaining that "one purpose of discussions is to advise offerors within the competitive range of informational deficiencies in their proposals so that they can be given an opportunity to satisfy the government's requirements" (quoting *Furuno U.S.A., Inc.*, B-221814, 86-1 CPD ¶ 400, 1986 WL 63429, at *3 (Comp. Gen. Apr. 24, 1986)), *aff'd*, 854 F.2d 464 (Fed. Cir. 1988); *Dynalantic Corp. v. United States*, 945 F.2d 416 (Fed. Cir. 1991) ("These discussions were held so that the agency could advise the offerors of any deficiencies in their proposals and also of any major concerns of the agency with the bids.  Under this system, the offerors were to be given an opportunity to satisfy the government's requirements, and to resolve any uncertainties in the terms and conditions of their proposals.  The purpose of these discussions was to enable the government to get the most advantageous contract possible.").

discussions — an almost textbook illustration of circular logic.[46]  As the Court explained above, however, the Army's conclusion is a reasonable one only if there are facts underlying its assessment that IAP could not alter the "apparent outcome of the source selection decision."  AR 9409 (SSDD).  But the Army points to no such data, analysis, or rationale.  The *assumption* that IAP could not win the procurement following discussions (and the submission of a FPR) is just that — an *assumption* — which is an insufficient basis for a conclusion to survive APA review.

At a minimum, the Court would expect the Army to explain *why* it bothered drafting (and even updating) ENs that the Army did not believe IAP could address or, having drafted them, *what* led the Army to believe that there was little to be gained by transmitting them as part of discussions (and, then, accepting FPRs).  This Court agrees with IAP that there is nothing in the record supporting the government's implicit assertion that there was some inherent obstacle to IAP's "providing further information in its narrative or staffing matrix to resolve . . . and correct[] the Army's initial evaluation."  Pl. MJAR at 20.

*Fourth*, while the government points to the fact that the SSA determined that "there is one offeror that offers the best value to the government" and thus "discussions are not required," Def. MJAR at 33 (quoting AR 9404), this Court rejects the implicit assertion that a best value decision may substitute for a determination not to conduct discussions where DFARS 215.306 applies.  By definition, every contract award in a best value procurement is premised upon a sound best value decision.  The fact that an agency arrives at a best value decision based upon a set of initial proposals cannot, standing alone, support a decision not to engage in discussions — such an approach would nullify DFARS 215.306.  The government no doubt would respond that the SSA did not consider the best value analysis in a vacuum but also "considered IAP's unacceptability, as well as the evaluations of each of the other offerors."  Def. MJAR at 33.  But, as the Court explained above, such a consideration — in terms of deciding whether to conduct discussions — merely assumes that IAP (and potentially the other offerors) could not have improved their potential for award.  Again, there is no evidence or rationale in the administrative record to support such a conclusion, and the Court rejects it.

*Fifth*, other documentation in the administrative record undermines the SSA's decision to select an awardee without discussions.  Specifically, the Army's Acquisition Plan for the procurement at issue anticipated that the Army would conduct discussions.  AR 333 (detailing schedule providing for final proposal revisions, which follow discussions pursuant to FAR 15.307).  More significantly still, the Source Selection Plan

---

[46] The Court once again agrees with IAP: "The SSA's stated premise turns DFARS 215.306 on its head, and tellingly, neither the SSA's paragraph in the SSDD nor any other record document demonstrate that the Army understood and applied that regulation when proceeding to award on initial proposals."  Pl. Resp. at 4–5.

("SSP") — a document upon which the SSA expressly relied in developing the SSDD, *see* AR 9399 — demonstrates that the Army intended to make a competitive range determination and conduct discussions. AR 4117–18. While the Court generally concurs with the GAO's view that an agency's violation of an SSP is not actionable *per se*,[47] the SSP document is part of the administrative record, and the Court may consider it in deciding whether a particular agency decision is rational. *See WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1379 n.2 (Fed. Cir. 2020) ("We consider the SSP in evaluating the rationality of the agency's actions."); *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 453–55 (2010) (discussing DFARS and other Department of Defense procedures governing SSPs, and concluding that "[b]ecause the SSA relies on the evaluators working for him [or her] to follow source selection plan mandates, departures from the plan could undermine the rationality of the ultimate source selection decision").[48]   The SSA, after acknowledging the applicability of the SSP, never explained why she departed from the plan here.

*Sixth*, the SSA used the incorrect lens in evaluating whether to conduct discussions. The SSA concluded that "discussions are not required," AR 9404, but that is not the right standard. No party — and certainly not this Court — asserts that discussions are *required* just because DFARS 215.306 governs a procurement.   Rather, as explained in

---

[47] *Epsilon Sys. Sols., Inc.*, B-409720, 2014 CPD ¶ 230, 2014 WL 3955222, at *6 (Comp. Gen. July 21, 2014) ("As stated above, the source selection plan was not provided to offerors nor was it incorporated into the solicitation. Thus, because the source selection plan here is an internal agency document that does not give rights to outside parties—contrary to the protester's suggestions otherwise—this protest ground is denied." (citing *Park Tower Mgmt. Ltd.*, B-295589, 2005 CPD ¶ 77, 2005 WL 924201, at *5 n.6 (Comp. Gen. Mar. 22, 2005) (denying challenge based on alleged deficiency in the application of an agency's source selection plan because such plans are internal agency instruction and do not give outside parties any rights)).

[48] *See also USfalcon*, 92 Fed. Cl. at 454 ("Thus, the failure of evaluators to follow the specific procedures and techniques mandated by a source selection plan, to the prejudice of a protester, could be evidence of an erroneous or biased evaluation."); *id.* at 455 ("With these various ways in which a source selection plan may be relevant to court review, it is little wonder that the source selection plan is identified in our rules as among the 'relevant core documents' of the administrative record which may be produced early to expedite a case." (citing RCFC App. C, ¶ 22(b))); *Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 328–29 (2009) ("A violation of a Source Selection Plan would, however, constitute a significant error if it 'deprived [a] plaintiff of the opportunity to have its proposal considered fairly and honestly.'" (alteration in original) (quoting *United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 322 (1998))), *aff'd*, 374 F. App'x 979 (Fed. Cir. 2010); *Sys. Application & Techs., Inc., v. United States*, 100 Fed. Cl. 687, 718 (2011) (analyzing agency's compliance with an SSP), *aff'd*, 691 F.3d 1374 (Fed. Cir. 2012); *cf. CDA Inv. Techs., Inc.*, B-272093, 97-1 CPD ¶ 102, 1996 WL 805036, at *3 (Comp. Gen. Sept. 12, 1996) (concluding, based in part on an SSP, that "[a]lthough section M of the RFP does not specifically include a factor for the evaluation of proposed subcontractors, such evaluation clearly would be logically encompassed by the 'technical qualifications' evaluation factor").

detail above, DFARS 215.306 instructs only that agencies "*should* conduct discussions" in procurements exceeding $100 million.   DFARS 215.306(c)(1) (emphasis added).   The problem is that the SSA's formulation suggests that she believed the choice was only between "shall" and "may."   Having determined that discussions were "not *required*," AR 9404 (emphasis added), the SSA apparently assumed she possessed "may"-level discretion, when in fact the DFARS imposes a presumption in favor of discussions.   As the FAR makes clear, the absence of mandatory language (*i.e.*, "shall") does not mean that agency discretion is total; put differently, "should" does not mean "shall," but neither is "should" synonymous with "may."   *See* FAR 2.101.[49]

Accordingly, the Court does *not* hold that the Army lacked discretion to decline to conduct discussions here; rather, just as in *Oak Grove*, 155 Fed. Cl. at 110, this Court concludes only that the DFARS presumption favoring discussions must be overcome with reasoned decision-making not reflected in the administrative record at issue. Notably, neither the SSAC report nor the SSDD ever mentions the DFARS provision.   *See id.* ("DFARS 215.306 quite clearly takes precedence in acquisitions exceeding $100 million. If anything, then, the [a]gency got the proper framework completely backwards because the DFARS provision makes conducting discussions the default absent a justification to the contrary." (citing *Dell Fed. Sys.*, 906 F.3d at 995–96)).   Because "the default rule in acquisitions exceeding $100 million favors discussions," the Army's task is "not to justify why 'discussions are necessary'" — or, as the SSA put it here, *required* — "but rather why they are unwarranted."   *Id.*

In sum, the administrative record, even generously interpreted, does not demonstrate that "the [Army] ever considered during the procurement the requirement of DFARS 215.306 that 'discussions normally are to take place in these types of acquisitions.'"   *Id.* (quoting *Dell Fed. Sys.*, 906 F.3d at 995–96).   At worst, the Army appears to have recognized the *required* DFARS *preference* for discussions — at least implicitly, as reflected in the SSP, AR 4117–18 — but then ignored the DFARS provision in practice.[50]

---

[49] *DynCorp International, LLC v. United States* addressed only the meaning of the word "preferred," with the Federal Circuit explaining that it connotes "more 'should' than 'shall.'"   10 F.4th at 1311. In *DynCorp*, the Federal Circuit interpreted a different FAR provision where "the FAR drafters' use of 'preferred' *and* 'may' . . . is consistent with the choice of technique being committed to a contracting officer's discretion." *Id.* at 1313 (emphasis added).   DFARS 215.306, in contrast, does not employ the operative word "may."   In *Dell Federal Systems*, the Federal Circuit specifically addressed the DFARS provision and concluded that "should" means that "discussions normally are to take place in these types of acquisitions." 906 F.3d at 995–96 (noting "the undisputed procurement defect of originally failing to conduct pre-award discussions, as reasonably interpreted by the agency to be required by the applicable regulations").

[50] The Court agrees with IAP that "at no point does the Army even acknowledge the DFARS 215.306 presumption that discussions are the expected course of action for this significant and

### 3. The Court Agrees with the GAO's General Interpretation of DFARS 215.306, But Rejects the GAO's *SAIC* Test

Vectrus, for its part, relies primarily and extensively on the GAO's decision in *Science Applications International Corp.* (*SAIC*), B-413501, 2016 CPD ¶ 328, 2016 WL 6892429 (Comp. Gen. Nov. 9, 2016), arguing that this Court must defer to the SSA's determination in this procurement not to engage in discussions because the SSA satisfied the *SAIC* "3-part-test." Intv. MJAR at 23–28 (discussing *SAIC*); Intv. Resp. at 9–11 (same).

Although the Court rejects the GAO's 3-part-test as not capturing the DFARS presumption favoring discussions, the Court begins with points of agreement with the GAO's *SAIC* decision. The Court agrees with the GAO that DFARS 215.306(c) "provides a basis . . . to review the agency's actions here." *SAIC*, 2016 WL 6892429, at *8. The Court further agrees with the GAO's general exposition of the DFARS provision:

> [F]ailure to hold discussions in high-dollar value, more complex source selections has led to misunderstandings of Government requirements by industry and flaws in the Government's evaluation of offerors' proposals, leading to protests that have been sustained, and ultimately extending source-selection timelines. DoD proposes to decrease the possibility of this outcome by making *such discussions the* ***default procedure*** *for source selections for procurements at or above $100 million*. However, use of the term "should," as defined in FAR part 2, provides that the expected course of action need not be followed if inappropriate for a particular circumstance.

*SAIC*, 2016 WL 6892429, at *8 n.6 (alteration in original) (emphasis added) (quoting Defense Federal Acquisition Regulation Supplement; Discussions Prior to Contract Award (DFARS Case 2010-D013), 75 Fed. Reg. 71,647, 71,648 (Nov. 24, 2010)).

Where the Court parts ways with the GAO, however, is with regard to its formulation of a "3-part" or "three factor" test (as Vectrus and the government respectively describe it). *See* Def. MJAR at 32; Def. Resp. at 14; Intv. MJAR at 23–24; Intv. Resp. at 9. The test is derived from the GAO's following summary of its precedent:

> We previously have found an agency's decision not to conduct discussions to be reasonable where the record showed [1] there were deficiencies in the protester's proposal,

---

complex DoD procurement, which the Army itself valued at more than $1 billion." Pl. MJAR at 19.

> [2] the awardee's proposal was evaluated as being technically superior to the other proposals, and [3] the awardee's price was reasonable.  *See Richard M. Milburn High Sch.*, B-277018, Aug. 19, 1997, 97–2 CPD ¶ 53 at 6; *Int'l Data Prods., Corp. et al.*, B-274654 *et al.*, Dec. 26, 1996, 97–1 CPD ¶ 34 at 10–11; *Stabro Labs., Inc.*, B-256921, Aug. 8, 1994, 94–2 CPD ¶ 66 at 2, 5.

*SAIC*, 2016 WL 6892429, at *9.  The problem the Court has with that approach is evident from the very next line in the *SAIC* decision: **"Although those cases pre-date [DFARS 215.306(c)], we find the principle applicable here."** *Id.* (emphasis added).

The Court simply does not understand how that *SAIC* test, derived from cases that *predate* DFARS 215.306 — and thus could not possibly have applied a regulation specifying a "default procedure" — should govern a procurement to which the DFARS provision applies.  Indeed, those earlier GAO decisions all assume that there is no default rule favoring discussions and that an agency's discretion to decline to conduct discussions is all but plenary[51] — as if the DFARS provision's "operative word," to use the GAO's terminology, were "may" and not "should."  *See, e.g., Int'l Data Prod.*, B-274654, 1996 WL 761964, at *8 (holding that "the burden is on the offeror to submit an initial proposal that adequately demonstrates its merits" and that "[g]iven that the agency received several other proposals that demonstrated significantly greater merit, and given that the agency was able to accept one of those offers without discussion, we have no basis to disagree with the [agency]'s actions").  Contrary to *International Data Products, Corp.*, the DFARS standard clearly requires more of an agency than merely showing that it "was able to accept . . . [an] offer[] without discussion." *Id.*  In sum, the *SAIC* decision correctly explained DFARS 215.306 in general, but the GAO did not apply it.

Although the GAO's three factor test in *SAIC* may make sense outside of DFARS 215.306, those factors swallow the DFARS 215.306 presumption whole.  The defect in *SAIC*'s analysis — and the GAO's application of DFARS 215.306 in practice — is that the second two *SAIC* considerations are nothing more than the sort of typical findings undergirding nearly every best value decision.  That means the critical factor in *SAIC* is the first one: "deficiencies in the protester's proposal." *SAIC*, 2016 WL 6892429, at *9.[52]

---

[51] Indeed, the GAO in *SAIC* expressly noted that "[i]n each published decision where [the GAO] has addressed [DFARS 215.306], it was found inapplicable to the procurement under protest, and, thus, we did not review the agency's actions under the regulation." *SAIC*, 2016 WL 6892429, at *8 n.7.

[52] The Court agrees with IAP's sentiment that "[i]t is no mystery why Defendants are so keen to invoke the GAO's *SAIC* test because the first element of that test focuses on whether there are deficiencies assigned to the protester's proposal." Pl. Resp. at 3.  IAP is correct, however, that "[o]bviously, the existence of a deficiency does not preclude discussions." *Id.*  Thus, as IAP argues, the correct "question for this Court is: given the record and the DFARS 215.306

But where a plaintiff challenges an agency's decision not to conduct discussions under DFARS 215.306, the agency will have, by definition, assessed the plaintiff's proposal with deficiencies (or significant weaknesses) — because the very point of discussions is to address such findings.  *See* FAR 15.306(d)(3) (discussions "must" include "deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond").  In contrast, where an agency has not assessed a proposal with a deficiency or significant weakness, the government is not required to engage in discussions with that offeror in any event.  *JWK Int'l Corp. v. United States*, 279 F.3d 985, 988 (Fed. Cir. 2002) ("aside from areas of significant weakness or deficiency, the contracting officer need not discuss areas in which a proposal may merely be improved").  That is a long way of saying that *SAIC*'s three factor test would all but swallow the DFARS provision, effectively reading the operative term "should" out of the regulation, replacing it with "may," despite those terms' having different definitions. *See* FAR 2.101.  Accordingly, the Court declines Vectrus's invitation to follow *SAIC*'s three factor test and, in effect, to disregard DFARS 215.306.

In *SAIC*, the GAO further acknowledged that it "generally does not review an agency's decision to make award without conducting discussions."  *SAIC*, 2016 WL 6892429, at *7.  That is because, according to the GAO, "there are 'no statutory or regulatory criteria specifying when an agency should or should not initiate discussions.'" *Id.* (quoting *Trace Sys., Inc.*, B-404811.4, 2011 CPD ¶ 116, 2011 WL 2321837, at *4 (Comp. Gen. June 2, 2011)).  That the cases upon which *SAIC* relies recognize an agency's virtually unfettered discretion to decide whether to conduct discussions is hardly surprising given that they do not involve the DFARS provision at issue here.  What *is* surprising, however, is that the GAO continues to apply such decisions in cases involving DFARS 215.306 even while acknowledging that the regulation requires more.

The government similarly argues that the Court of Federal Claims' decision in *Dell Federal Systems* "embraced the GAO's [*SAIC*] test for determining the reasonableness of the agency's decision not to conduct discussions," Def. MJAR at 32 (citing *Dell Fed. Sys., L.P. v. United States*, 133 Fed. Cl. 92 (2017), *rev'd*, 906 F.3d 982 (Fed. Cir. 2018)),[53] but the trial court's decision must give way to the Federal Circuit.  In that regard, the Federal Circuit in *Dell Federal Systems* "embraced," if anything, *only* the first part of the GAO's

---

presumption, whether the Army made a rational decision to deviate from the DFARS-presumed path of discussions."  *Id.*

[53] Def. Resp. at 16 (arguing that "[t]he SSA's conclusions satisfy GAO's *SAIC* test").

*SAIC* decision — the part of *SAIC* generally interpreting DFARS 215.306, with which this Court registered its agreement, *supra* — and *not* the 3-part-test specifically.[54]

More significantly still, an examination of the Federal Circuit's decision in *Dell Federal Systems* demonstrates that the same flaws the Army had identified in that procurement apply with equal force to the one at issue here:

> Had the Army conducted pre-award discussions, several of the lower-priced offerors deemed unacceptable—either as a result of ambiguous Solicitation requirements or otherwise—might have revised their initial proposals, which then might plausibly have been found technically acceptable. Opening discussions with all offerors . . . is a reasonable vehicle to allow offerors to propose compliant equipment and modify prices accordingly. We determine that the corrective action of conducting discussions is rationally related to the **undisputed procurement defect** *of originally failing to conduct pre-award discussions*, as *reasonably interpreted by the agency to be required by the applicable regulations*, in the first instance.

*Dell Fed. Sys.*, 906 F.3d at 996 (emphasis added) (citations omitted).

Just as the Federal Circuit agreed with the Army's assessment in *Dell Federal Systems* that discussions were effectively "required by the applicable regulations" — because "the lower-priced offeror[] deemed unacceptable . . . might have revised [its] initial proposal[], which then might plausibly have been found technically acceptable" and awardable, *id.* — the administrative record in this case provides no support for the contrary *assumption* the Army made regarding IAP's proposal, *see Oak Grove*, 155 Fed. Cl.

---

[54] In particular, the Federal Circuit discussed *SAIC* as follows:

> FAR 2.101 defines "should" to mean "an expected course of action or policy that is to be followed unless inappropriate for a particular circumstance," and the GAO has applied FAR 2.101 to interpret DFARS 215.306(c)(1). *See Sci. Applications Int'l Corp.* (*SAIC*), No. B-413501, 2016 WL 6892429, at *8 (Comp. Gen. Nov. 9, 2016) (finding, in a case of first impression by the GAO, that DFARS 215.306(c)(1) is reasonably read to mean that "discussions are *the expected course of action* in [Department of Defense] procurements valued over $100 million" (emphasis added)).

*Dell Fed. Sys.*, 906 F.3d at 996. The Federal Circuit did not adopt *SAIC*'s three-part test upon which the government and Vectrus rely.

at 109 (holding that a "conclusory statement is plainly insufficient to satisfy DFARS 215.306").

### 4. The Government's Failure to Follow DFARS 215.306 Constitutes Prejudicial Error

Relying upon *Quantico Tactical Inc. v. United States*, 150 Fed. Cl. 566 (2020), *aff'd*, 835 F. App'x 598 (Fed. Cir. 2021), the government contends that "an agency is not obligated to conduct discussions with a technically unacceptable offeror." Def. MJAR at 34; *see also* Intv. MJAR at 33. That is a generally uncontroversial proposition, but critically assumes the agency has made a competitive range determination. Thus, if anything, *Quantico Tactical* illustrates the Army's procedural error in this procurement, as well as the prejudice to IAP. In that case, plaintiffs "challenge[d] their exclusion from the competitive range," and this Court found that the contracting officer reasonably "concluded that Quantico was not among the most highly rated offerors," that Quantico was unable "to meet all of the technical subfactors," and that "[n]o offerors with such a rating were included in the competitive range, which is consistent with the Source Selection Plan's instruction that unacceptable technical factors were unawardable." *Quantico Tactical*, 150 Fed. Cl. at 567, 572. This Court agrees with Judge Bruggink's decision in *Quantico Tactical* that an "agency is well within its rights to be selective in setting the competitive range, a determination that is owed a great deal of deference regardless of the number of offerors and is, in any event, a result clearly spelled out in the solicitation and source selection plan." *Id.* at 572. In this case, however, *the Army made no competitive range determination* and that failure, itself, was inconsistent with the SSP, as explained above.[55]

To put a fine point on the problem posed by a comparison of the facts of this case to those at issue in *Quantico Tactical*, this Court has no idea whether IAP would have been included in the competitive range (or not), assuming the Army had proceeded with discussions after properly considering the DFARS presumption favoring them. Employing the proper lens of DFARS 215.306, the SSA in this case still could have: (1) made a competitive range determination that included IAP; (2) made a competitive range determination that excluded IAP; or (3) perhaps supported a decision not to conduct discussions at all (*i.e.*, with a more robust and rational analysis or with additional facts absent from this administrative record).[56] But, even if the SSA reasonably had

---

[55] *See USfalcon*, 92 Fed. Cl. at 454 (explaining that "if no reason is given for departing from a source selection plan (or the departure is not highlighted to allow the SSA to articulate a reason), a departure could be due to error," or "to benefit a particular offeror[,] [p]articularly when the SSA bases his ultimate decision not on the proposals themselves but on briefings in which the ratings are presented as the inputs for his calculus, an unjustified departure from a source selection plan may rob this ultimate decision of its rational basis" (footnote omitted)).

[56] *See* discussion *infra* Section V.I.

excluded IAP from the competitive range, IAP would have had the opportunity to challenge *that* decision.  In other words, the contracting officer had to make such a decision in the first instance, and IAP could then test that decision against the administrative record.  The Court cannot merely assume that the contracting officer would have reached a particular conclusion in order to declare harmless error (or no prejudice) in favor of the government and Vectrus.

Put differently, the fact that a correct application of DFARS 215.306 may have kept IAP in the competition is sufficient to demonstrate prejudice.  As the Federal Circuit acknowledged in *Dell Federal Systems*, "[h]ad the Army conducted pre-award discussions, several of the lower-priced offerors deemed unacceptable—either as a result of ambiguous Solicitation requirements or otherwise—might have revised their initial proposals, which then might plausibly have been found technically acceptable."  906 F.3d at 996.  Such a finding, equally applicable here, supports this Court's determination that the Army's error is prejudicial to IAP.  *See Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015) ("[A]ll a protester must establish to demonstrate prejudice is that it has a substantial chance of receiving the contract—*that it is a qualified bidder and could compete for the contract*." (emphasis added)).  The evaluation results of the initial proposals are not dispositive.  *Id.* ("The fact that [the plaintiff] did not submit the lowest-priced bid of its affiliated entities during the initial bidding process does not preclude it from having a substantial chance of winning a hypothetical reopened bid for that contract . . . .*"); *see also WaveLink*, 154 Fed. Cl. at 283 (discussing prejudice standards); *Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 421 (2018) (finding prejudice and noting that the "technical evaluation, price realism analysis, and best value determination would all have been revised in a but-for world").

The government's position is that "even if [the Army] had conducted discussions, it would not have done so with IAP."  Def. MJAR at 34 (citing AR 9885–86).  To support that assertion, the government relies upon debriefing materials that are nothing more than a *post hoc* guess about what the Army might have done but never did here — establish a competitive range that excluded IAP.  Given that there is no contemporaneous evidence in the administrative record demonstrating what the competitive range determination would have been, the Court will not rely on the debriefing materials to make some sort of harmless error guess in favor of the government.  *See Rig Masters, Inc. v. United States*, 70 Fed. Cl. 413, 424 (2006) ("materials [that] do not relate to events that transpired *during the procurement process*" but instead "involve the debriefing that occurred only after the parties received notification that the [government] had chosen a contractor," are "post hoc rationalizations" that this Court will not review); *Fort Carson Support Servs.*, 71 Fed. Cl. at 591–92 ("But while such debriefings might, on occasion, yield useful party admissions, any new explanations of the evaluation process made post-award are the sort of '*post hoc* rationalizations' that courts reject when offered by the government in bid protest cases."); *USfalcon*, 92 Fed. Cl. at 464 ("Courts must review such non-contemporaneous documents with care, to make sure that the

statements are a reflection of the views held by the evaluators when the evaluation occurred rather than '"*post hoc*" rationalizations.'" (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971))); *Braseth Trucking, LLC v. United States*, 124 Fed. Cl. 498, 509 (2015) (a "debriefing letter . . . is a post hoc explanation of the [agency's] decision . . . and therefore entitled to less weight").

Accordingly, even if the evidentiary value of the debriefing material is not zero, it is not sufficiently probative for the government to demonstrate harmless error.  The Court further notes that the government has the discretion to include even technically unacceptable proposals in the competitive range.  *Aviation Ground Equip.*, 2021 WL 2109102, at *8 ("[T]he determination whether a proposal should be included [in the competitive range] is principally a matter within the sound judgment of the procuring agency.  While exclusion of technically unacceptable proposals is permissible, it is not required." (citations omitted)).  In that vein, the GAO has explained:

> The FAR makes clear one of the purposes of discussions is to address deficiencies and significant weaknesses in proposals. FAR 15.306(d)(3).  While the agency found numerous deficiencies in [the awardee]'s initial proposal, [the awardee] submitted a lengthy and complete—albeit technically unacceptable—initial proposal prior to the time for receipt of proposals.  In this regard, we have previously concluded agencies may reasonably open discussions where initial proposals do not provide all information needed to evaluate the proposals.  Agencies have significant discretion to select proposals for inclusion in the competitive range . . . .

*Aviation Ground Equip.*, 2021 WL 2109102, at *8 (citation omitted).  Thus, the Court will not assume that the Army necessarily would have excluded IAP from the competitive range.[57]

Similarly, while Judge Bruggink's decision in *Quantico Tactical* — again, a decision upon which the government relies — correctly explains that while FAR 15.306 "contemplates, if not requires, agencies taking deficiencies and weaknesses into account in making the competitive range determination," it is also the case that "FAR part 15

---

[57] For example, given the relatively small number of proposals and IAP's lower proposed cost, the Army may have decided that any efficiency gains from eliminating a single proposal would be minimal.  *See* FAR 15.306(c)(2)–(3) (efficiency considerations).  The Court, in that regard, further agrees with IAP that it is difficult to understand how the Army could "credibly claim that there was no meaningful benefit to be gained from conducting discussions to save potentially hundreds-of-millions."  Pl. Resp. at 7; *cf. Level 3 Commc'ns, LLC v. United States*, 129 Fed. Cl. 487, 507 (2016) ("[T]he court has determined that the CO's decision not to enter into negotiations in light of the significant price disparity was arbitrary, capricious, and an abuse of discretion.").

establishes that the steps in a negotiated procurement (competitive range determination and discussions) be taken seriatim *and that they be independent of one another*." 150 Fed. Cl. at 573 (emphasis added). Because "[t]he purpose of the competitive range determination, as made clear in FAR part 15.306, is to winnow the number of offerors with whom discussions are required . . . , the former cannot anticipate the latter, otherwise its purpose would be frustrated." *Id.*

The undersigned agrees with Judge Bruggink, but his observation cuts both ways: just as a plaintiff eliminated from the competitive range cannot claim that it should have been included in the competitive range based solely on its projected outcome of discussions, the government cannot be permitted to speculate about a competitive range determination it never made or employ mere assumptions about the outcome of discussions to avoid making a competitive range determination in the first instance. Again, the Army's failure here to perform the correct analysis or to reach a reasonable conclusion — at least given the administrative record as it currently stands — constitutes prejudicial error. *See Dell Fed. Sys.*, 906 F.3d at 996 (explaining that offerors "deemed unacceptable" may improve their competitive position via discussions); *see also Info. Tech.*, 316 F.3d at 1319 (holding that, to establish prejudice, a plaintiff must only demonstrate that its "chance of securing the award must not have been insubstantial," and that a plaintiff demonstrates prejudice where the agency "improperly failed to conduct 'discussions' . . . [and] if it had, [the plaintiff] would have been able to cure deficiencies in its bid").[58]

Next, Vectrus argues that any failure to conduct discussions is harmless error because the Solicitation, by its terms, precluded the Army from including IAP in the competitive range in any event. Intv. Resp. at 21; *see also* Def. Resp. at 15. Relying upon *2M Research Services, LLC v. United States*, 139 Fed. Cl. 471, 477 (2018), Vectrus asserts that exclusion from the competitive range "is mandatory where the solicitation terms preclude the agency from advancing initial proposals that fail to achieve a [specified] minimum adjectival rating." Intv. Resp. at 21. According to Vectrus, IAP could not have been included in the competitive range because the Solicitation provided that proposals with less than an "Acceptable" rating on Subfactor 2 would "not move forward in the

---

[58] The government invokes the prejudice formulation from *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) — "that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a *reasonable likelihood* that the protester would have been awarded the contract" (emphasis added). *See* Def. Resp. at 17. The Court here finds such a "reasonable likelihood" is present here because a correct application of the DFARS provision may result in IAP's being included in the competitive range for discussions; the subsequent submissions of FPRs means that any offeror may still win the procurement. *See Data Gen. Corp.*, 78 F.3d at 1562. In any event, IAP "does not have the burden of showing that it would have received the contract." *Cyios Corp. v. United States*, 122 Fed. Cl. 726, 736 (2015) (citing *Data Gen. Corp.*, 78 F.3d at 1562), *aff'd*, 674 F. App'x 1016 (Fed. Cir. 2017).

source selection process." *Id.* (quoting AR 3113–14 (§ M.1.A)). That is *not* what the Solicitation says.

Section M.1.A of the Solicitation provides as follows:

> To receive consideration for award, a rating of no less than "Acceptable" must be achieved for the [o]fferor's Mission Support/Technical Approach Factor. Offerors with individual sub-factor ratings of less than "Acceptable" on Sub-factors 1 *and* 2, or with an individual [s]ub-factor rating less than "Pass" on Sub-factors 3 *and* 4 will not move forward in the source selection process, and will not be considered for award.

AR 3113–14 (emphasis added). Vectrus's argument relies upon an out-of-context excerpt of that language that omits the operative phrase "less than 'Acceptable' on Sub-factors 1 *and* 2" — including, critically, the conjunctive word "and." AR 3114 (§ M.1.A) (emphasis added). In order for an offeror to "not move forward in the source selection process" — whatever that phrase may mean[59] — an offeror must receive a rating of less than "Acceptable" on both "Subfactors 1 *and* 2." AR 3113–14 (emphasis added).

There is just no other way to read the Solicitation. *See Middleton v. Shinseki*, 727 F.3d 1172, 1178 (Fed. Cir. 2013) ("use of the conjunctive 'and' . . . must [be] give[n] meaning"); *Watson v. Dep't of Navy*, 262 F.3d 1292, 1299 (Fed. Cir. 2001) (explaining that "[t]he inclusion of the conjunctive 'and' in [the regulation] clearly indicates that all three [of the enumerated] criteria must be demonstrated"); *cf. Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 950 (Fed. Cir. 2016) ("Because the written description does not compel a disjunctive construction for 'and,' the claim term should be given its plain and ordinary meaning."). In this case, IAP did not receive less than an "Acceptable" rating in *both* "Sub-factors 1 and 2" and, thus, this provision does not apply. In contrast, Vectrus's reading would improperly require this Court to replace the word "and" with "or."

### 5. IAP's Argument is Timely

Finally, Vectrus — but not the government — contends that "because the RFP terms conflicted with the DFARS 215.306 standard as expressed by this [C]ourt, any challenge based on [the Army] having flipped the starting point [for] the analysis under

---

[59] Although the Solicitation language upon which Vectrus relies for its argument plausibly refers to "mov[ing] forward" into the competitive range for the purposes of discussions, the Solicitation language also may refer simply to being considered in the final best value tradeoff calculus. The language is not sufficiently precise, and in any event, there is no need for the Court to decide the definitive meaning of the phrase.

DFARS 215.306 . . . is untimely." Intv. Resp. at 12–13 (arguing for the application of *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007)). Vectrus argues, in particular, that the Solicitation's language here — "informing offeror[s] that discussions would be conducted only if the contracting officer determine[s] discussions '*are necessary*'"[60] — is materially different than the language at issue in *Oak Grave*, wherein this Court rejected several versions of a *Blue & Gold* timeliness argument. *Oak Grove*, 155 Fed. Cl. at 110–13.

Just as this Court rejected identical arguments in *Oak Grove*, the Court does so here, as well. Indeed, on this issue, the Court concurs with the GAO, which likewise rejected the very same argument in *SAIC*:

> [T]he agency also argues that because the solicitation included a provision notifying offerors of the agency's intent to make award without discussions, SAIC's claim regarding discussions is untimely. We disagree. The solicitation provision cited by the agency also stated that the agency reserved the right to open discussions, as did a second, separate solicitation provision. Accordingly, SAIC was not required to raise its claim until it became evident that the agency had, in fact, decided not to conduct discussions.

*SAIC*, 2016 WL 6892429, at *8 n.8 (citations omitted); *see also Chenega Healthcare Servs., LLC v. United States*, 138 Fed. Cl. 644, 653 n.5 (2018) (discussing *SAIC* and concluding that such a "waiver argument has been rejected by the GAO and must be rejected here as well").[61]

As was the case in *SAIC*, the Solicitation at issue here similarly "reserve[d] the right to hold discussions." AR 3952 (§ L.5.1.A); AR 3113 (§ M.1.A.). More significantly, the "if necessary" Solicitation language upon which Vectrus relies, AR 3952 (§ L.5.1.A),[62] does not alter the Court's analysis because that language adds nothing to — and is simply borrowed from — FAR 52.215-1, which was incorporated into the Solicitation. *See* AR 3123 (§ M.5) (incorporating FAR 52.215-1 by reference); FAR 52.215-1(f)(4) (providing that the agency "reserves the right to conduct discussions if the Contracting Officer later determines them to *be necessary*" (emphasis added)). That same FAR provision was at

---

[60] Intv. Resp. at 12 (emphasis added) (citing AR 3952 (§ L.5.1.A), 3956 (§ L.7.2), 3113 (§ M.1.A.), 3123 (§ M.5)).

[61] Had IAP challenged the Solicitation in a pre-award protest, the government no doubt would have argued that such an action is not ripe.

[62] *See also* AR 3113 (§ M.1.A) ("Should the Contracting Officer determine discussions are *necessary*[,] the [g]overnment reserves the right to hold them." (emphasis added)).

issue in both *Oak Grove* and *SAIC*, having been included in the solicitations at issue in those cases just as it is in the Solicitation here.   *Oak Grove*, 155 Fed. Cl. at 110–13; *SAIC*, 2016 WL 6892429, at *2.   Thus, contrary to Vectrus's assertion, there is no material difference between the Solicitation's language here and that at issue in *Oak Grove* and *SAIC*.  Indeed, neither the government nor the GAO noted any timeliness issue with IAP's arguments based upon DFARS 215.306 in this matter.  *See IAP Worldwide Servs.*, 2021 WL 2766441, at *11 (rejecting DFARS 215.306 protest grounds on the merits); AR 12142–43.

Once again, the Court emphasizes that the government argued *against* the application of *Blue & Gold* in *Dell Federal Systems*, and the Federal Circuit identified no such timeliness problem in that case.  *Oak Grove*, 155 Fed. Cl. at 111 (explaining that "the government in *Dell Federal Systems* took the position that *Blue & Gold* was inapplicable (and not merely because the government's decision to engage in discussions pursuant to DFARS 215.306 was part of corrective action)" (citing Reply and Response Brief of Defendant at 9, *Dell Fed. Sys., L.P. v. United States*, 133 Fed. Cl. 92 (2017) (Nos. 17-465C, 17-473C), ECF No. 129)).

\* \* \* \*

The Court concludes that IAP has succeeded on the merits of Count I of the amended complaint.  The Court notes that it is not imposing the DFARS provision on the Army; rather, the Department of Defense itself promulgated that provision to restrict the discretion of its component agencies — as interpreted by the government (before the Federal Circuit in *Dell Federal Systems*).  Whether or not the government likes the rules it has imposed upon itself, they are not for the Court to change. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68 (1954) (finding that agencies are bound to follow their own rules, even self-imposed procedural rules that limit otherwise discretionary decisions); *see also Lyles v. Dep't of the Army*, 864 F.2d 1581, 1583 (Fed. Cir. 1989) ("The Army must abide by its own regulation, even if it is more rigorous than necessary.").

### H.  The Army's Best Value Determination Was Rational (Count VIII)

IAP's final challenge to the procurement at issue is that the Army conducted an "irrational" best value determination because IAP was "excluded . . . from the tradeoff decision" due to the "unequal and irrational deficiency" assigned to IAP for Subfactor 2. Pl. MJAR at 48–49; Am. Compl. ¶¶ 281–282; Pl. Resp. at 2.

Because IAP's best value challenge rests entirely on the premise that the Army's evaluation of Subfactor 2 was arbitrary and capricious, Count VIII must fail.  As the Court explained above, the Army's decision to award IAP a deficiency on Subfactor 2 was reasonable.  *See* discussion *supra* Section V.A.  Accordingly — and putting aside that discussions, FPRs, and a new round of evaluations would moot the best value decision here — the Court rejects IAP's claim that the Army conducted a flawed best value

determination based on the offerors' initial proposals.  In that regard, the Court next turns to whether the procurement decision at issue should be enjoined.

## I.  The Court's Record Requires Further Development Regarding an Appropriate Remedy

In an action pursuant to 28 U.S.C. § 1491(b)(2), this Court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."  *See CNA Corp. v. United States*, 83 Fed. Cl. 1, 10 (2008) (holding that "this court has discretion to fashion awards that include a mixture of injunctive relief and bid preparation and proposal costs"), *aff'd sub nom. The CNA Corp. v. United States*, 332 F. App'x 638 (Fed. Cir. 2009).

Where a plaintiff has succeeded on the merits, the trial court is not required to issue injunctive relief.  *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 193 (1978) ("[A] federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law.").  Rather, a plaintiff bears the burden of demonstrating that this Court should exercise its discretion to issue injunctive relief.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (citing cases and noting that "[t]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion").[63]  In *PGBA, LLC v. United States*, for example, the Federal Circuit concluded that the Tucker Act, as amended by ADRA, 28 U.S.C. § 1491(b)(4), "only incorporates the standard of review of section 706(2)(A) [of the APA] and therefore does not deprive a court of its equitable discretion in deciding whether injunctive relief is appropriate."  389 F.3d 1219, 1225–26 (Fed. Cir. 2004).  The Federal Circuit "thus h[e]ld that, in a bid protest action, section 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award."  *Id.* at 1226 (reasoning that "[t]his construction is consistent with the language of 28 U.S.C. § 1491(b)(2), which, through use of the permissive 'may,' provides

---

[63] The Supreme Court in *eBay* formulated the injunctive relief factors as follows:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc.*, 547 U.S. at 391.

the Court of Federal Claims with discretion in fashioning relief"); *see also Dellew Corp. v. United States*, 108 Fed. Cl. 357, 375 (2012) ("success on the merits does not entitle a protester to an injunction").

In deciding whether "a permanent injunction is warranted," this Court "must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Centech Grp.*, 554 F.3d at 1037 (citing *PGBA*, 389 F.3d at 1228–29). "[P]roving success on the merits is a necessary element for a permanent injunction," but "[w]e may balance the remaining three *Centech* permanent injunction factors—irreparable harm, balance of hardships, and public interest—when deciding whether to grant or deny injunctive relief[.]" *Dell Fed. Sys.*, 906 F.3d at 999 & n.13.

The Supreme Court has rejected the application of any categorical rule favoring either the grant or denial of injunctive relief in a particular case. *eBay Inc.*, 547 U.S. at 393–94 (holding that "[t]o the extent that the District Court adopted such a categorical rule, then, its analysis cannot be squared with the principles of equity adopted by Congress," and that "[j]ust as the District Court erred in its categorical denial of injunctive relief, the Court of Appeals erred in its categorical grant of such relief"). In each case, a trial court must exercise its judgment and discretion — given the specific facts — in deciding whether to issue an injunction. Indeed, notwithstanding that a cause of action pursuant to 28 U.S.C. § 1491(b) may be "generally recognized to serve the public interest," there is "no basis for concluding that [a plaintiff] is relieved of showing irreparable harm and other usual prerequisites for injunctive relief." *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 65 (1975). Echoing the principle that there are no presumptions favoring injunctive relief, Judge Allegra explained the basic calculus:

> While it is oft-stated that a "weakness of the showing regarding one factor may be overborne by the strength of the others," *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993), that balancing argument only goes so far, for it is axiomatic that the basis for a grant of permanent injunctive relief "has always been irreparable harm and inadequacy of legal remedies." [*Rondeau*, 422 U.S. at 57 (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959))].

*Reema Consulting Servs., Inc. v. United States*, 107 Fed. Cl. 519, 530 (2012).

Accordingly, and as the Supreme Court has explained in a different context, "[i]n selecting a remedy[,] the lower courts should exercise 'the sound discretion which guides the determinations of courts of equity,' keeping in mind the role of equity as 'the instrument for nice adjustment and reconciliation between the public interest and private

needs as well as between competing private claims.'"  *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 386 (1970) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944)).  Again, even when the government's compliance with law is at stake, there is no presumption favoring the issuance of injunctive relief:

> In brief, the bases for injunctive relief are irreparable injury and inadequacy of legal remedies.  In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  Although particular regard should be given to the public interest, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law."

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987) (alteration in original) (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982)); *see also Heritage of Am., LLC v. United States*, 77 Fed. Cl. 81, 84 (2007) ("With respect to equitable relief, . . . the lawsuit poses the question [of] whether, given those defects, fairness to plaintiff, to the beneficiaries of the support services in question, to the intervenors, to the Government, and to the public at large counsels in favor of granting the tailored equitable relief[.]").

Notwithstanding the absence of ironclad rules, this Court has developed a fairly well-defined set of injunctive relief principles routinely applied in § 1491(b) cases.  For example, "[t]he Court of Federal Claims has repeatedly held that a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract." *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016) (quoting *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013)), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018). That concept stretches back more than two decades.  *See, e.g., United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 571 (2000); *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 552 (2011) ("The Court concludes it is well-established that the potential profits that are lost to offerors when arbitrary procurement actions would deprive them of the opportunity to compete for a contract will normally be sufficient to constitute irreparable injury."); *HP Enter. Servs., LLC v. United States*, 104 Fed. Cl. 230, 245 (2012) ("This court, in many cases, has found that the loss of the opportunity to fairly compete for a contract constitutes irreparable harm."); *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 514 (2013) (noting that the "denial of a fair opportunity to compete and loss of financial benefit from a lawful procurement process constitute irreparable harm"); *Red River Commc'ns, Inc. v. United States*, 109 Fed. Cl. 497, 518–19 (2013) ("This court has held that loss of an opportunity to

compete constitutes irreparable harm.”); *Sierra Nevada Corp. v. United States*, 154 Fed. Cl. 424, 440 (2021) (“This Court consistently has held that the lost opportunity to compete for a contract constitutes irreparable harm.”).[64]

Similarly, regarding the public interest injunctive relief factor, this Court has long held that where “a [p]laintiff has established that defendant’s contract award violated procurement regulations and involved arbitrary and capricious behavior[,] [t]he public interest in preserving the integrity of the procurement system . . . weighs in favor of granting injunctive relief.” *Caddell Constr. Co. v. United States*, 111 Fed. Cl. 49, 117 (2013); *see also BCPeabody Constr. Servs.*, 112 Fed. Cl. at 514 (“It is well established that the public interest is well-served by ensuring that the government procurement process is fair and even-handed” (citing *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 221 (2004), *aff’d*, 389 F.3d 1219)); *MVM, Inc. v. United States*, 46 Fed. Cl. 137, 143 (2000) (“Many cases have recognized that the public interest is served when there is integrity in the public procurement system.”). Judge Bruggink explained the “overarching” principle in *RLB Contracting, Inc. v. United States*: “The public interest always favors the correct application of law,” and “[m]ore particularly, in the context of procurement statutes, the public interest always favors open and fair competition, and to that end, agency compliance with applicable regulations.” 118 Fed. Cl. 750, 761–62 (2014) (citing *Lab. Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 654 (2014)), *aff’d*, 621 F. App’x 1026 (Fed. Cir. 2015); *see also HVF W., LLC v. United States*, 148 Fed. Cl. 45, 57 (2020) (holding that an injunction “to preserve the fairness of competition for government contracts . . . is not of minor import” because “indeed, this is the function of the court’s bid protest jurisdiction”).

The forgoing general principles do not amount to *per se* rules requiring an injunction and no judge of this Court considering *eBay* appears to have applied that case to reject them. *See, e.g., RLB Contracting*, 118 Fed. Cl. at 761 & n.10 (concluding that “in

---

[64] To cite another example, in *Global Computer Enterprises, Inc. v. United States*, this Court explained:

> Plaintiff has established irreparable injuries based upon losing (1) the opportunity to participate in a competitive procurement for this type of work, *see Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 110 (2004), (2) potential profits, *see SAI Indus. Corp. v. United States*, 60 Fed. Cl. 731, 747 (2004), and (3) skilled employees critical to its ability to perform specialized financial management systems work, *see Univ. Research Co., LLC v. United States*, 65 Fed. Cl. 500, 514 (2005).

2008 WL 4725410, at *1 (Fed. Cl. Mar. 31, 2008). In contrast, this Court “has not required proof that the contractor would be forced out of business to show irreparable harm.” *EMTA Isaat, A.S. v. United States*, 123 Fed. Cl. 330, 340 (2015).

the context of a bid protest, the loss of an opportunity to compete for an award for which a party would not otherwise be disqualified is sufficient injury to warrant injunctive relief" and distinguishing *eBay*); *Rush Constr., Inc. v. United States*, 117 Fed. Cl. 85, 102 (2014) ("[T]he acceptance of lost profits as a satisfactory showing of irreparable harm does not create a presumption that the court will award a permanent injunction. Nor does the court purport to establish such a presumption."); *MORI Assocs.*, 102 Fed. Cl. at 552 (holding that *eBay* "merely stands for the proposition that the four-factor test—which our court applies in bid protest cases—cannot be displaced by a general rule automatically granting injunctions for certain violations" and that "to recognize that meritorious bid protests that involve lost profits will satisfy the irreparable harm factor is not the same as automatically granting an injunction, as the other two factors must still be considered").[65]

Turning to the facts of this case, and applying the above principles, the Court notes the paucity of briefing the parties provided regarding injunctive relief. IAP's motion for judgment on the administrative record spends little more than a page on the issue, and, for the most part, simply invokes the generic, standard legal principles from the § 1491(b) cases discussed above (*i.e.*, regarding irreparable harm and the public interest) that every plaintiff in every bid protest seems to invoke mechanically and often with little evidentiary support.[66] Pl. MJAR at 49–50. IAP *does* persuasively argue, however, that the government faces little risk of harm and "no risk of delay or gap in the solicited services, because Vectrus continues to supply those services today." *Id.*

The government's argument is longer, but, like IAP's, is short on substance, relying primarily on generic legal arguments, rather than addressing the specific facts and context of this procurement. Def. MJAR at 57–60. The government's main thrusts are based upon the Supreme Court's *eBay* decision: that accepting IAP's contentions regarding irreparable harm and the public interest "would create a presumption in favor of an injunction, which the Supreme Court rejected in *eBay*." *Id.* at 59. In terms of the public interest, specifically, the government asserts that national security considerations militate against an injunction. *Id.* at 59–60. Vectrus says almost nothing, relying only upon the argument that "IAP has failed to establish success on the merits of its protest." Intv. MJAR at 60. Vectrus does not address the subject at all in its response brief.

---

[65] *Cf. HP Enter. Servs.*, 104 Fed. Cl. at 245 & n.13 (declining to reach the government's argument "that recent precedent shows that this court has not properly applied the 'irreparable harm' factor in bid protest cases, and that economic harm is not sufficient for an injunction to issue in favor of a bid protestor" and noting that "[t]o the court's knowledge, there is no binding precedent from the Federal Circuit which addresses defendant's argument").

[66] *But see PGBA*, 389 F.3d at 1231–32 (finding that the lower court did not abuse its discretion in holding that injunctive relief was unwarranted, in particular because the government provided sufficient factual *evidence* to support its position regarding each factor in the test for injunctive relief).

The Court addresses the government's national security argument first. *See* 28 U.S.C. § 1491(b)(3) ("In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security[.]"). The government argues that "[t]he impacts on the United States if the services provided by the contact are interrupted are dramatic and severe[.]" Def. MJAR at 59. In support of that assertion, the government relies upon a declaration submitted by Major General [ * * * ]. ECF No. 35-1 (Harm Declaration). The Court accepts the Major General's Harm Declaration and credits it fully. But the Harm Declaration is of limited scope, supporting only the conclusion that this Court "should award a narrowly tailored injunction" that permits "the Army the flexibility to continue performance for a reasonable time to ensure that this national security requirement is not disrupted." Def. MJAR at 60. The Harm Declaration does *not* support the conclusion that the public interest "factor weighs in favor of the agency" more broadly, such that this Court should deny any and all equitable relief. *Id.*

While the government asserts that "[t]he potential harm to the Army of an injunction outweighs any harm that IAP alleges," Def. Resp. at 29, the government erroneously assumes that the only injunctive relief under consideration involves halting Vectrus's performance on the already awarded contract. IAP disclaims that it seeks such relief. Pl. Resp. at 30 ("IAP does not ask this Court to issue an order that would force the Army to cease the OMDAC-SWACA operations."). And, based on the Major General's Harm Declaration, the Court would not order such relief in any event. Rather, IAP only seeks "injunctive relief appropriate to require the Army to reopen the procurement, including conducting discussions, and making a new award decision." *Id.* The government's Harm Declaration does not speak to — and there are no other facts in the administrative record addressing — the potential harm to the government were the Court to issue the less intrusive equitable relief IAP requests.

Although the Court determines that IAP succeeds on the merits of its discussions claim, *see* discussion *supra* Section V.G, the Court nevertheless is unprepared — at least on this record, and for the reasons explained below — to order the government to go back and redo its procurement process. *See Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1317 (Fed. Cir. 2012) (Prost, J., concurring) ("the plaintiff bears the burden of establishing the four equitable factors that weigh in its favor in order to obtain a permanent injunction"). Additional factual development is necessary, an approach the Federal Circuit has endorsed. *PGBA*, 389 F.3d at 1229 (affirming trial court's denial of injunctive relief and noting, with approval, that "the [trial] court held an evidentiary hearing in order to create a complete record regarding the consequences of granting or denying injunctive relief").

IAP asserts that the government's position, opposing an injunction, ignores "the long line of decisions affirming that (1) a protester suffers irreparable harm where, as here, the procurement errors prevent the offeror from a meaningful opportunity to

compete, and (2) the loss of potential profits from a government contract constitutes irreparable harm."  Pl. Resp. at 29.  The Court agrees with the IAP that considering such factors does not run afoul of the Supreme Court's decision in *eBay*, *see id.* at 29 n.18, but that does not mean IAP may talismanically invoke them to require this Court to issue injunctive relief.

Given this Court's merits determination on IAP's first count, regarding DFARS 215.306, this Court at most would order an injunction, remanding the matter to the Army, as IAP suggests.  *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (explaining that, when an agency's fact-findings and explanation are deficient, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *In re Hodges*, 882 F.3d 1107, 1117 (Fed. Cir. 2018) ("When faced with . . . deficient factual findings, 'we have consistently vacated and remanded for further proceedings.'" (quoting *In re Van Os*, 844 F.3d 1359, 1362 (Fed. Cir. 2017))).  Thinking such relief through, however — and how it might play out in practice — tends to demonstrate that IAP's claim of irreparable harm is quite weak.  On remand, as suggested above, there are several discrete, mutually-exclusive possibilities:

1.  The Army correctly considers and applies DFARS 215.306 and determines, once again, that it will not engage in discussions.  In that case, IAP will not receive the contract at issue.

2.  The Army correctly considers and applies DFARS 215.306 and determines that it will form a competitive range for discussions, but IAP is excluded from the competitive range.  In that case, IAP will not receive the contract at issue, but the Army would then have to conduct discussions with the offerors remaining in the competitive range, none of which have protested the outcome of this procurement.

3.  The Army correctly considers and applies DFARS 215.306 and determines that it will form a competitive range for discussions, and IAP is included in the competitive range.  In that case, IAP will have a chance to submit a FPR, but the outcome of the procurement remains uncertain; IAP may win the contract award, or it may not.

What is evident from the above possibilities — putting aside that IAP could challenge the outcome of the first two scenarios as well — is that any argument predicated on the notion of lost profits is highly speculative in IAP's case.  Again, the Court must be clear about the theoretical underpinnings of an irreparable harm finding; the idea is that a plaintiff

> will suffer irreparable harm if an injunction is not granted, because the only other available relief—the potential for recovery of bid preparation costs—would not compensate it for its loss of valuable business on this contract.  This type of

> loss, deriving from a lost opportunity to compete on a level
> playing field for a contract, has been found sufficient to prove
> irreparable harm.

*Seattle Sec. Servs., Inc.*, 45 Fed. Cl. at 571; *cf. Chapman L. Firm Co. v. United States*, 67 Fed. Cl. 188, 193 (2005) ("[P]articularly in the arena of government contracting, in which an economic loss will not be compensable with money damages . . . economic loss can rise to the level of irreparable injury. Accordingly, this court has found that lost profits, or even the loss of an opportunity to earn profits, is 'sufficient to constitute irreparable harm.'" (quoting *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005))). The loss of a mere chance of winning a contract does not demonstrate lost profits with sufficient certainty such that it constitutes irreparable harm *per se*.

That is a long way of saying that "[d]ecisions in this court have *not* indicated that lost profits *necessarily* constitute irreparable harm[;] [r]ather, individual cases have recognized that, in some circumstances, the loss of a business opportunity, coupled with an unfair procurement process, may result in irreparable harm to a plaintiff." *Caddell Constr. Co.*, 111 Fed. Cl. at 116 (emphasis added). In this case, the idea that the government's error has caused even "the loss of an opportunity to earn profits" is wholly speculative. *Cf. Electra-Med Corp. v. United States*, 791 F. App'x 179, 182 (Fed. Cir. 2019) (concurring with trial court's finding "that [Plaintiff]'s injury—the loss of the opportunity to compete for a government contract—though irreparable, was temporary and speculative, not weighing heavily in favor of an injunction"). Nor did the government entirely deny IAP the opportunity to compete. IAP submitted an initial proposal and the Court, in this decision, has concluded that the Army's substantive evaluation of that initial proposal was not erroneous or unreasonable. Given the Solicitation's repeated warnings that the Army intended to award the contract without discussions, IAP had sufficient notice that it was not guaranteed an opportunity to a submit a FPR as part of discussions. IAP thus presumably took its best shot in the initial proposal and nevertheless was evaluated as unacceptable.

On this record, and notwithstanding that IAP has succeeded on Count I of its amended complaint, the Court cannot conclude that IAP is entitled to participate in discussions and to submit a FPR for a second round of evaluations. Accordingly, at most, what IAP lost here was the opportunity to be considered for the competitive range, assuming that the Army could not justify its refusal to engage in discussions. In sum, given this record, it is far from assured that that IAP would wind up in the mix even if the Court were to remand the issue to the Army for the correct application of DFARS 215.306.

That is not to say that IAP is not prejudiced by the government's failure to apply the DFARS provision. To the contrary, the Court has determined that IAP has suffered legally cognizable prejudice. Nevertheless, this may be a rare circumstance in which a

plaintiff has demonstrated sufficient prejudice to prevail on the merits but insufficient harm to demonstrate that the Court should order injunctive relief. As the Court explained in great detail above, this Court's application of the injunctive relief factors should not be mechanical but rather must take into account the particular facts and circumstances of each individual case. Moreover, the government's violation of law does not entitle a plaintiff to equitable relief. The Court cannot but help to ask whether the government should really be forced to engage in a process that may culminate in a competitive range (and hence discussions) that ultimately excludes IAP but that includes offerors that never protested the lack of discussions or the outcome of the procurement. The Court has insufficient information to definitely answer that question and thus remains uncertain as to whether equitable relief should be "the remedy for the foot fault here." *Cohen v. LyondellBasell Indus. N.V.*, 492 F. Supp. 3d 14, 19–20 (E.D.N.Y. 2020); *cf. Mills*, 396 U.S. at 386–88 (holding that "nothing in the statutory policy [of the Securities Exchange Act of 1934] 'requires the court to unscramble a corporate transaction merely because a violation occurred,'" and that the transaction "should be set aside only if a court of equity concludes, from all the circumstances, that it would be equitable to do so" (quoting *Mills v. Elec. Autolite Co.*, 403 F.2d 429, 436 (7th Cir. 1968), *vacated sub nom. Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970))). The Court notes, however, that this case is not like *Oak Grove*, in which the Court held "[g]iven the facts of th[e] procurement — *i.e., where all offerors or nearly all offerors submitted non-compliant proposals* — the [a]gency should have conducted discussions." 155 Fed. Cl. at 110 (emphasis added).

On the other hand, the government "has not indicated any special consequence" if this Court were to require the government to go back and consider whether discussions should be conducted under a proper application of DFARS 215.306, and, if so, whether IAP should be included in the competitive range. *BCPeabody Constr. Servs.*, 112 Fed. Cl. at 514. In sum, "[t]he government has not demonstrated that the balance of hardships should weigh in its favor." *Id.* Indeed, just as in *WaveLink*, "[i]n balancing the harms, the Court notes that the government never discussed or even asserted [how] it would be harmed by an injunction." 154 Fed. Cl. at 288–89. While the government made clear that interrupting Vectrus's performance of the contract at issue may jeopardize national security, the government did not present any cogent argument against more limited injunctive relief or, in particular, the remand IAP seeks. *Id.* ("Although the Court reasonably speculates that the [a]gency is likely to incur some hardship due to the time, cost, and administrative effort it will need to expend to revisit the . . . procurement, the Court will not make this argument for the government . . . .").

In sum, considering both the public interest in ensuring the government follows its own procurement rules as well as the national security component to this case, the Court will not act hastily one way or the other. Accordingly, the parties shall provide the Court with supplemental briefing addressing the applicable injunctive relief calculus as the Court has described it in this decision. The parties also shall address whether IAP is entitled to its bid preparation and proposal costs. *See Reema Consulting*, 107 Fed. Cl. at

532 (outlining the standard for the recovery of bid and proposal costs); *MVM, Inc. v. United States*, 47 Fed. Cl. 361, 366 (2000) ("[T]he plain language of 28 U.S.C. § 1491(b)(2) permits the grant of proposal and preparation costs as well as injunctive relief.  The statute contains no condition that if injunctive relief has already been granted, monetary damages are not available."); *CNA Corp.*, 83 Fed. Cl. at 10.

## VI.    CONCLUSION

The Court **GRANTS** IAP's motion for judgment on the administrative record, in part (*i.e.*, with respect to Count I of IAP's amended complaint); IAP's motion for judgment on the administrative record otherwise is **DENIED**.  Conversely, the Court **GRANTS** the government's and Vectrus's respective cross-motions for judgment on the administrative record for Counts II through IX of IAP's amended complaint; with respect to Count I, the government's and Vectrus's respective cross-motions are **DENIED**.

The Court reserves the question of appropriate relief in this case pending further briefing.  The Court will issue a separate order directing such briefing.

**IT IS SO ORDERED**.

s/Matthew H. Solomson
**Matthew H. Solomson**
**Judge**